**CALIFORNIA WELFARE RIGHTS OR-GANIZATION et al., Plaintiffs,**

**v.**

**Elliot RICHARDSON, Secretary, United States Department of Health, Education and Welfare, Defendant.**

**Civ. No. C-72 341.**

United States District Court,
N. D. California.

Sept. 13, 1972.

492

Ralph Santiago Abascal, Jay-Allen Eisen, Edmund S. Schaffer, Jerry D. Craig, S. F. Neighborhood Legal Assistance Foundation, Peter Coppelman, Senior Citizens Project, Cal. Rural Legal Assistance, San Francisco, Cal., Stephen R. Elias, Center on Social Welfare Policy and Law, New York City, Patricia Butler, National Legal Program on Health, U.C.L.A. School of Law, Los Angeles, Cal., Michael Trister, Washington Research Project, Washington, D. C., for plaintiffs.

James L. Browning, Jr., U. S. Atty., with John D. Link, Asst. U. S. Atty., San Francisco, Cal., for defendant.

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS MOTION.

WOLLENBERG, District Judge.

Plaintiffs, some of whom are individuals currently receiving benefits under the Medi-Cal program and two of which are unincorporated organizations alleged to be largely composed of Medi-Cal recipients, have brought this action to challenge the decision of the defendant Richardson, Secretary of Health, Education and Welfare, approving what is known as the "California co-payment experiment". The action is brought by plaintiffs on their own behalf and on behalf of all persons who will be forced to pay a part of the cost of Medi-Cal benefits as a result of the Secretary's decision.

## JURISDICTION

Plaintiffs claim a wide and somewhat curious array of jurisdictional bases, including 28 U.S.C. § 1337 (Commerce and Anti-Trust Regulations). Among this array is found the judicial review provided by the Administrative Procedure Act, 5 U.S.C. §§ 701 et seq., erroneously cited in the First Amended Complaint at 5 U.S.C. §§ 70 et seq.

The defendant has moved pursuant to Rule 12(b)(6), F.R.Civ.P., to dismiss for failure to state a claim on which relief can be granted, or alternatively, for summary judgment pursuant to Rule 56. Plaintiffs have also moved for summary judgment.

█ The defendants apparently concede that there is jurisdiction over the subject matter of the action. Both parties apparently agree that the decision in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L. Ed.2d 136 (1971), determines that judicial review of the Secretary's decision is available. Clearly, the parties cannot by stipulation confer jurisdiction, and whether or not *Overton Park* controls depends upon the particular statutory language under which the Secretary here acted.

Chapter XIX of the Social Security Act, as amended, establishes a means of partial federal funding of state plans for providing medical services to those who are unable to pay the cost themselves. § 1901 of the Act, 42 U.S.C. § 1396. An extensive list of requirements that must be included in any state plan that is to receive such finding is set out in § 1902, 42 U.S.C. § 1396a. One of the requirements is that the plan must provide that

> "any deduction, cost sharing, or similar charge imposed under the plan with respect to inpatient hospital services or any other medical assistance furnished to an individual thereunder, . . . shall be reasonably related . . . to the recipient's income or his income and resources". 42 U.S.C. § 1396a(a)(14)(B).

Section 1115 of the Act, 42 U.S.C. § 1315, entitled "Demonstration Projects", on the other hand, gives broad power to the Secretary to authorize projects which do not fit within the normal guidelines. Specifically, the Secretary is given the authority to "waive compliance with any of the requirements of" § 1902 "to the extent and for the period he finds necessary to enable such State or States to carry out such project . . . .". The statute's only restriction on what can be done by way of experi-

mental, pilot or demonstration project is that the project must be one which "in the judgment of the Secretary is likely to assist in promoting the objectives of . . . subchapter [among others] XIX . . .". The immediate difficulty encountered in applying that language is that the "objectives" of title XIX are nowhere to be found.

■ Is the decision as to which "experimental" projects are "likely to assist in promoting" the unstated objectives of the title, one which must be considered to be "committed to agency discretion by law" 5 U.S.C. § 701(a)(2) so that no judicial review is possible? In *Overton Park*, the Secretary of Transportation was barred from prohibiting a highway route which utilized parkland "unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park" 401 U.S. at 411, 91 S.Ct. at 821. The Court there found that "there was law to apply" and judicial review was, therefore, available. The direction to the Secretary here is considerably less clear. In order to review his decision, it must be determined what the objectives of the title are, or, arguably, whether the Secretary's understanding of the objectives is clearly wrong; secondly, it must be determined whether the experiment is "likely to assist in promoting" those objectives.

The plaintiffs' argument that the "objectives" may be derived from the requirements set forth in § 1902 is most troubling, and must be rejected, in the Court's view for the reasons discussed hereafter. Were § 1902 the only source for deriving the "objectives of the title", the Court would be forced to conclude

that there was no jurisdiction to review the Secretary's action because of the exception created by 5 U.S.C. § 701(a)(2); in short, there would simply be no law to apply.

Such a drastic result need not be reached because objectives may be found in the sections of title XIX apart from § 1902, particularly § 1901, 42 U.S.C. § 1396. As will be developed, those provisions do provide a means of testing the Secretary's action challenged here.[1]

## THE FACTUAL SETTING

Prior to the inauguration of the California co-payment project, and in accordance with the requirements of § 1902(a)(14) and the regulations thereunder, the recipient paid nothing for any of the covered services or prescription drugs under the Medi-Cal program. The project imposes a charge of one dollar upon each "provider" (doctor or other professional) visit and a charge of fifty cents on each prescription filled. The charges apply only to the first two visits or prescriptions each month so that the potential liability cannot exceed three dollars per person per month.[2]

The co-payment charges are imposed only upon a portion of those who are receiving Medi-Cal benefits. Those who are designated as "Medically Needy Only" are those who are not receiving cash assistance under one of the "categorical aid" programs funded in part by federal funds. All members of that group are required to co-pay. Among those receiving assistance under a categorical aid program, only those who have either income in addition to the welfare check, or those whose resources are in excess of certain prescribed levels

1. See generally; Davis, Administrative Law, § 28.16 (1970 Supp.) and the cases there cited; the authorities cited at n. 23, 401 U.S. 411, 91 S.Ct. 814, and accompanying text; and The Supreme Court, 1970 Term, 85 Harv.L.Rev. 3, 317, n. 19 (1971).

2. The actual process by which the co-payment is imposed consists of a reduction in the amount payable to a provider or pharmacist for a specified service or drug by an amount equal to the relevant co-payment. The collection of the sum is totally the responsibility of the provider or pharmacy, and he or it can decide to waive collection of the charge in a given case. The provider or pharmacist cannot recoup the waived co-payment from Medi-Cal.

are required to co-pay. The fact is, however, that in California none of the recipients of categorical aid have a total income sufficient to meet their most basic needs, according to the State's own figures. It is also clear that in computing the amount needed for such basic needs, the State *excludes* all expense for medical care.

Applying the rule set out in § 1902(a)(14)(B), quoted above, it becomes quite clear that no recipient of categorical aid is, by the State's own figures able to pay anything for medical care—the amount of payment that could be required as reasonably related to income and resources is precisely zero. In recognition of that fact, California sought, and was granted, a waiver of the requirements of § 1902(a)(14)(B) to conduct the Co-Payment Experiment. The waiver was originally granted for one year, with an option to continue it six additional months upon the Secretary's approval.

The stated purpose of the co-payment project is to test the validity of seven hypotheses. Those are set out in the margin.[3] In summary, it would not be inaccurate to state the purpose as an attempt to determine whether the mechanism of co-payments at the stated levels can reduce the costs of the Medi-Cal program without reducing the delivery of needed services. Where the line is to be drawn between "significant" and "insignificant" health care problems, between "over-utilization" and proper utilization of services, how such lines are to be drawn, and by whom, are questions, as plaintiffs note, to which there are, at present, no answers.

## PLAINTIFFS' CONTENTIONS

All of plaintiffs' challenges are statutorily based. Initially, they contend that the provisions of § 1115 do not authorize the Secretary to approve any project which results in a lowering of benefits from the level mandated by the requirements of § 1902. Since the plain wording of the statute gives no hint of such a limitation, plaintiffs fall back upon the intent of those in HEW who proposed to Congress the amendment to the Act which became § 1115, and the practice of the agency in interpreting the section. It is maintained, essentially without contradiction, that no project which would have resulted in a lowering of the level of benefits has ever been approved, prior to this California project. Curiously, there is no showing whatsoever, that any state had ever proposed such a project before, much less that such a proposal had been rejected by the Secretary.

■■■■ There is nothing that would lend the weight of either authority or reason to the remarkable proposition that what the members of the executive bureaucracy may have in mind when they submit proposed legislation to Congress can control the construction of the statute enacted. Particularly must this conclusion be so when the language of the statute is clear and quite unambiguous. "In the case of *any* experimental, pilot or demonstration project . . ." [emphasis supplied] is the language of the statute. If the criteria set forth there are met, there is no basis for limiting its application to one particular category of project. The conduct of the agency in approving projects in the ten

---

3. 1. Copayment will not deter beneficiaries from obtaining care for significant health problems.
   2. Copayment will deter beneficiaries from seeking care for insignificant health problems.
   3. Copayment will not result in a level of care lower than that received by the average Californian.
   4. Copayment will not result in lower participation in the program by providers.
   5. Copayment will deter beneficiary over-utilization.
   6. Copayment will result in an overall reduction in services rendered per beneficiary.
   7. Copayment will not result in a significant decline in preventative care.

years since the time § 1115 was enacted is equally unavailing to modify its plain phrasing. Apart from the fact that failure to approve a given type of project can hardly have meaning unless it is a refusal of a request actually made, it seems quite plain that the sort of experimental projects which are going to be approved may be much more closely related to the political and sociological orientation or general policy, of the Administration then in power than with its understanding of what the statute authorizes.

■ Plaintiffs next contend that approval of the California project is in excess of the authority vested in the Secretary because the project conflicts with an objective of title XIX. As noted above, the first problem is to ascertain just what the objectives are.

It is easy enough to look to the many, detailed provisions set forth in § 1902 and conclude that those requirements for what state plans must contain to be eligible for federal funding under title XIX announce the objectives of the title. Those requirements speak of minimum services to be covered, of the eligibility of various groups of potential recipients, of fiscal controls, of due process safeguards in administration of the program, of administration designed to foster the delivery of services, and other matters. Each requirement is phrased as a general guideline, and a great many would seem to set forth a basic goal of the program which Congress sought to insure would be followed. Many of them could well be understood as objectives. Objectives, however, are relevant only in conjunction with § 1115 experimental projects and it is § 1115 which authorizes any one or more of those requirements to be waived. In view of that waiver, what really is left—as noted previously, the aim of providing medical assistance to those whose income and resources are inadequate to meet the costs. That is set forth in § 1901, 42 U.S.C. § 1396. Considered as a governing objective in terms of § 1115, that provision is not without content, and

would limit experimental projects to some extent. To go beyond that general aim, and to translate a selected number of the § 1902 requirements into objectives, so that those requirements cannot be waived under § 1115 does violence to the plain wording of that latter section. There is no ascertainable basis for distinguishing the waivable "requirement" from the unwaivable "objective".

Consideration of the provisions of § 1903(e), 42 U.S.C. § 1396b(e), would also seem to furnish the basis for deriving an objective of the title. That provision requires the States to move toward a broadening of services and coverage under its plan with a target date, presently set in 1977, for completion of a comprehensive program. Section 1904, 42 U.S.C. § 1396c, would seem to contemplate an objective of insuring conformity with the approved state plan, by requiring the Secretary to terminate payments in the event of non-compliance.

Outside of the provisions of § 1902, the plaintiffs offer no other basis for deriving an objective by which the co-payment project can be judged. An examination of the whole of title XIX persuades the Court that the above-stated provisions exhaust the possibilities of objectives which might be said to bear on the co-payment project.

The defendants point out that there have been serious fiscal problems over the years since the Medicaid program was initiated. Costs have risen dramatically, to an extent that the future of the entire program may be imperiled. The stated purposes of the California experiment might be expressed as an attempt to see how imposition of some cost-sharing will decrease utilization of the program benefits, and, consequently, costs. The results of the experiment may indicate some means of maximizing the benefits that can be conferred within a limited range of resources available—the cost-benefit ratio alluded to in oral argument.

■ By measuring the project against any of the enumerated possible

objectives, the Court can find no conflict which would require the Secretary to refuse to approve the project. It may be conceded that co-payment does not directly advance the objective of comprehensive care derived from § 1903(e), but it does not directly impede progress to that goal either. It may, in fact, be fiscally possible to achieve such comprehensive coverage only by imposing some control on utilization such as a co-payment requirement. The Secretary is required to make a judgment that a project proposed under § 1115 is "likely to assist in promoting the objectives" of the title. That judgment could rationally be made with respect to a project which was directed to promoting one of several objectives, even if another objective would suffer by reason of the project's operation, so long as the Secretary concluded that *on balance* the objectives considered together were likely to be advanced. It is not necessary to find that one project will promote all of the objectives in order to sustain the Secretary's approval of it.

■ Of course, it is possible that the Secretary could reasonably conclude that a project was likely to assist in promoting the objectives, only to discover at the completion of the project that nothing of the sort, in fact, was accomplished. The requirements of § 1115 do not require certainty much less prescience, on the Secretary's part as to the results. Moreover, the experimental project which "fails" may well assist in promoting the objectives precisely by demonstrating what will not work, and what should therefore, be avoided in formulating the requirements for state plans.

It goes without saying that experiments upon the most basic living conditions of human beings who are to a very large extent totally dependent upon governmental programs for their very existence, is a most serious matter. The only

thing more serious than an experimental program that does not produce beneficial results, is the non-experimental, standard program, statutorily mandated which so fails. Certainly one purpose of the § 1115 program is to discover what may work on a limited scale before it is incorporated into the mandatory requirements for all state plans.

■ Specifically, imposition of what the defendants denominate "nominal" co-payments may well have a most disruptive effect upon the finances of many of the recipients required to co-pay under the terms of the experiment. The burden to pay up to three dollars per person per month falls on individuals and families whose income and resources are beyond question, by the State's own standards, wholly inadequate to meet the costs of the necessities other than medical care. Many questions may validly be raised regarding the wisdom of the Secretary's decision to approve the experiment, covering as it does hundreds of thousands of people for at least one year and possibly eighteen months. The charge that the decision was an expedient of policy raises more questions. Those questions are not judicial. They are issues to be resolved in Congress and at the polls. There can be no doubt that Congress has the power to confer upon the Secretary the broad discretion that it has in enacting § 1115. The Executive must answer to Congress on the manner in which the discretion is exercised.[4]

■ Finally, the plaintiffs contend that even if the Secretary acted within his authority on approving the project, he abused his discretion under § 1115 because the project approved cannot be a valid experiment. This argument is based upon an analysis of the project as approved from a social science point of view. It is argued, for example, that because no definition of "over-utilization" has been made in advance of the

---

4. Section 1120 of the Act, 42 U.S.C. § 1320, requires the personal approval of the Secretary or Under Secretary for all projects under § 1115 of which any part is wholly financed by federal funds. In addition, it requires the Secretary to submit to Congress, upon such approval, a description of the project.

experiment, no valid conclusions can be drawn on whether co-payment reduces over-utilization without affecting "utilization" for necessary services.

The project may well suffer from numerous defects when judged against a scientific model. This Court does not, however, function as a scientific critic, it may only review the Secretary's action in terms of the statute's requirements. The statute speaks of "experimental, pilot, or demonstration projects" without furnishing a definition of any of those terms. In plain language, "experiment" must be understood as a trial conducted for the purpose of testing a proposition. The Secretary cannot be held to standards of scientific precision in that testing process. He deals not in the abstract, but with concrete and real problems. In the nature of his duties, he is obliged to make decisions about the most important matters on the basis of inadequate data, and an incomplete understanding of all of the factors. He may approve experiments, therefore, which may produce only rough, inexact, partially ambiguous data. While the conclusions he draws from such experiments may not stand the test of science, they nevertheless may be useful in making the decisions he is called upon to make.

It is clear that the co-payment project is designed to collect data which may well be of significance both in the administration of the present Medicaid program and in the process of proposing legislative modifications to it. As such, the project meets the requirements imposed by § 1115.

Plaintiffs do not make any showing that the co-payment project is a sham instituted for the purpose of evading Congressionally mandated requirements which state plans must meet. Despite the large number of individuals whom the project affects, it is still definitely limited in scope and in duration. There is, then, no occasion here to attempt to determine at what point an experiment must be held to cease and a standard program to begin in fact. As a matter of principle, it is clear that the Secretary would abuse his discretion if he were to approve a project which went beyond that point by either subjecting an unreasonably large population to the experiment or continuing it for an unreasonably long period.

In sum, then, the Secretary in approving the California co-payment project acted within the scope of his authority and cannot be said to have abused his discretion in so acting. The defendants' motion for summary judgment should be granted, and the plaintiffs' cross-motion denied.

It is so ordered.