**Fannie CRANE and Evelyn Jackson, Individually and on behalf of all other persons similarly situated**

v.

**David MATHEWS, Individually and in his capacity as Secretary of the United States Department of Health, Education and Welfare, et al.**

Civ. A. No. C75–2317A.

United States District Court, N. D. Georgia, Atlanta Division.

Feb. 5, 1976.

On Motion for Temporary Injunctive Relief Feb. 9, 1976.

On Motion for Permanent Injunction June 14, 1976.

Wayne M. Pressel, Georgia Legal Services, Inc., Atlanta, Ga., Lawrence R. Mullen, Los Angeles, Cal., Adele M. Blong, NLSP Center of Social Welfare Policy and Law, Inc., New York City, for plaintiffs.

Arthur K. Bolton, Atty. Gen., Stephen L. Cotter, Asst. Atty. Gen., State of Ga., Atlanta, Ga., for Busbee, Parham and Thurmond.

Julian M. Longley, Jr., Asst. U. S. Atty., N. D. Ga., Atlanta, Ga., for Mathews and Federal defendants.

## ORDER

MOYE, District Judge.

This case is before the Court on plaintiffs' motion for preliminary injunction. The action brought by two named plaintiffs on behalf of themselves and all Georgia Medicaid beneficiaries, challenges the approval of a demonstration project, entitled "Recipient Cost Participation in Medicaid Reform," undertaken by the State of Georgia in connection with its Medicaid program under Title XIX of the Social Security Act of 1935, as amended, 42 U.S.C. § 1396 et seq. The project purports to be an attempt to demonstrate the effectiveness of recipient financial participation in the costs of certain medical care provided under the program.

Plaintiffs challenge the approval of the project, asserting that the Court has jurisdiction over the Secretary under 5 U.S.C. § 701 et seq., and over the state defendants pursuant to 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983. In addition, plaintiffs assert jurisdiction for declaratory relief under 28 U.S.C. §§ 2201 and 2202. The complaint sets forth four counts against the state and federal defendants: (1) Plaintiffs contend that in approving this project, the Secretary acted beyond the scope of his authority under 42 U.S.C. § 1315, thereby violating 42 U.S.C. § 1396a(a)(14) and 45 C.F.R. 249.49(a)(1); (2) that the project was not designed, processed, or approved in accordance with applicable federal requirements set forth in the Handbook of Public Assistance Administration,, Part IV, § 8400 et seq.; (3) that defendants failed to give Medicaid beneficiaries timely notice of the project and opportunity to object and seek administrative review, thereby contravening 45 C.F.R. 205.5 ("State Plan Amendments") and 205.10 ("Hearings"); and (4) that the failure of the state to give timely notice of the waivers and opportunity to seek administrative review violates the Due Process Clause of the Fourteenth Amendment.

The state and federal defendants assert that Congress has granted the Secretary broad discretion under 42 U.S.C. § 1315 to authorize states to conduct pilot, demonstration, and experimental projects in conjunction with approved state plans under the public assistance titles of the Social Security Act, including the Medicaid program, and that the Georgia project fully meets all statutory and administrative requirements for approval of such projects.

Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, provides for the establishment of cooperative federal-state programs, commonly called "Medicaid", to provide payment for "necessary medical services" rendered to certain "[needy] individuals, whose income and resources are insufficient to meet the costs of [these] services." 42 U.S.C. § 1396. States which choose to participate in the Medicaid program must submit to the Secretary of Health, Education, and Welfare a "state plan" which fulfills all requirements of the Act. *See* 42 U.S.C. 1396a. If the state submits a plan which fulfills all requirements set out in section 1396a and implementing federal rules, then the Secretary must approve it. Georgia participates in the Medicaid program under such an approved state plan.

Title XIX requires that states which institute Title XIX plans provide Medicaid assistance at least to individuals receiving grants under the cash assistance program of the Social Security Act[1] (the "categorically needy"). 42 U.S.C. § 1396a(a)(10)(A). In addition, the statute permits the states at their option, to include certain other individuals. 42 U.S.C. § 1396a(a)(10)(B). The Georgia program is limited to the categorically needy.

The statute also sets out, at 42 U.S.C. § 1396d(a)(1)–(17), the mandatory and optional medical services which are available under the program. States, like Georgia, which cover only the categorically needy must provide at least the services listed in § 1396d(a)(1)–(5): certain inpatient hospital services, outpatient hospital services, laboratory and x-ray services; covered skilled nursing facility services for individuals 21 years of age and older; early and periodic screening, diagnosis, and treatment services for children under 21; family planning services and supplies; and physicians' services. 42 U.S.C. § 1396a(a)(13)(B). In addition the state must provide a mix of institutional and non-institutional care and serv-

ices, and home health services for any individual entitled under the state plan to skilled nursing facility services. *Id.* These items of medical care are commonly known as "mandatory" or "required" services. The other services listed in § 1396d(a), which a state may offer, if it chooses, are called "optional" services.

Among the state plan requirements set out in § 1396a(a) is the requirement in subsection (14) governing the imposition of co-payments or cost-sharing on Medicaid beneficiaries. The statute, 42 U.S.C. § 1396a(a)(14), 45 C.F.R. 249.40(a)(1), provides that cash assistance recipients and certain other individuals may not be required to contribute to the costs of mandatory services under the program, and that any such charge with respect to other medical care under the program will be nominal in amount, as determined in accordance with standards approved by the Secretary and included in the plan. 42 U.S.C. § 1396a(a)(14)(A)(ii). The statute allows a broader scope with respect to individuals other than the categorically needy. 42 U.S.C. § 1396a(a)(14)(B). The co-payment provisions of the Act have been implemented by the Secretary in regulations at 45 C.F.R. 240.40, *as amended,* 39 F.R. 36590 (October 11, 1974), 39 F.R. 39267 (November 6, 1974).

While state requirements under Title XIX are mandatory upon the states, Title XI of the Act, section 1115, 42 U.S.C. § 1315, provides a mechanism whereby such requirements may be waived in certain circumstances. As pertinent to this case, section 1115 provides that:

"In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of [the public assistance titles of the Act] in a State or States—

(a) The Secretary may waive compliance with any of the [state plan] require-

---

1. Those programs are the Aid to Families with Dependent Children program (Title IV of the Act, 42 U.S.C. § 601 *et seq.*); the Supplemental Security Income program (Title XVI of the Act, 42 U.S.C. § 1381 *et seq.*); and the aid to the aged, blind, and disabled programs in Guam, Puerto Rico, and the Virgin Islands (Titles I, X, XIV, and XVI of the Act, 42 U.S.C. §§ 301 *et seq.*, 1201 *et seq.*, 1351 *et seq.*, 1381 *et seq.*).

ments of section . . . 1396a . . to the extent and for the period he finds necessary to enable such State or States to carry out such project . . ."

It is with respect to this provision of the Act that this case is concerned.

On September 15, 1975, the State of Georgia submitted to HEW an application for a section 1115 demonstration project, entitled "Recipient Cost Participation in Medicaid Reform." The application, in part, sought permission for the state to impose co-payments with respect to certain mandatory Medicaid services otherwise exempted from co-payment by statute. The imposition of co-payments represented an alleged state experiment designed to devise a mechanism which would curtail over utilization in Georgia of "marginally needed" health care. The state proposes to impose co-payments for some, but not all, types of mandatory medical care—certain inpatient and outpatient hospital services and physicians' services. Certain preventive services are to be exempted from the co-payments, such as services resulting from EPSDT referrals, family planning services, and physicians' services delivered in institutions. Moreover, co-payments are not required for children eligible under the Child Welfare or Aid to Families with Dependent Children foster care programs. The amount of the co-payment is $2.00 for all other office and home physicians', outpatient hospital, emergency room, psychiatric, and physical medicine services. A co-payment of 50% of the state's payment for the first day of care up to a maximum of $25.00 is to be made on inpatient hospital services except those resulting from EPSDT referrals. A refund would be made to the recipient of all co-payments when those payments exceeded six physician or outpatient visits over a continuous six-month period or when inpatient hospitalization was in excess of a continuous twelve-month period. One co-payment would be required for each program of care. A "Recipient Special Services" function would be created within the Medicaid program to provide a mechanism for recipients to appeal cases in which co-payment created a special financial difficulty.

After evaluation of the proposal, the Acting Social and Rehabilitation Service (SRS) Administrator, John A. Svahn, recommended approval of the co-payment project for one year in an Action Memorandum to the Secretary, dated October 24, 1975, if seven or ten staff comments on the project, set out in the Action Memorandum, were satisfied. The Action Memorandum noted the importance of the project in terms of national health insurance but did not, however, set forth a precise articulation of the manner in which the project was likely to assist in achieving the objectives of Title XIX, as required by the waiver provision of 42 U.S.C. § 1315.

On November 14, 1975, then Acting SRS Administrator John C. Young (who was serving in that capacity in the absence of Mr. Svahn) formally approved the project. On November 24, the state was so notified by letter from William C. Pembleton, SRS Grants Management Officer, to T. M. Parham, Commissioner of the Georgia Department of Human Resources. The approval letter authorized the state to commence the project on December 1, 1975, and set forth five conditions that the state must meet by January 1, 1976. The approval resulted in a waiver, pursuant to 42 U.S.C. § 1315(a), of federal provisions governing co-payments under the Medicaid program.

Before the program could begin, however, plaintiffs, on November 28, filed suit in this Court seeking, among other things, a temporary restraining order against the Secretary and Georgia officials to block initiation of the project. On December 3, the Court issued an order restraining the Secretary and Georgia officials from implementing the project and requiring them to notify appropriate individuals that the project had been restrained and to instruct all providers of services to return any recipient financial contributions which might already have been made. The Court also ordered a hearing on a motion for preliminary injunction for December 23. A hearing was held on December 23, and a subsequent hearing on December 31 on plaintiffs' motion for preliminary injunction.

Between the time of the December 23 and 31 hearings, a second Action Memorandum was issued from SRS Administrator Svahn to the Secretary. In the second memorandum, dated December 29, the Administrator advised the Secretary of developments in the structure and content of the Georgia project since the time of approval on November 14. More specifically, he summarized and reviewed the recent communications between federal and state officials with respect to the five additional requirements set forth in the November 24 approval letter and informed the Secretary that he had determined that Georgia had fully satisfied all conditions except one, involving the identification by a panel of competent medical experts of services as severely needed which are to be exempted from the experiment. The Administrator informed the Secretary that he had extended the date for full satisfaction of that condition until February 1, 1976, but that the project might proceed at any time prior to that date even without such satisfaction. The Court has been informed by the state defendant that this condition has been satisfied. Furthermore, the second Action Memorandum also set forth in considerable detail the Title XIX objectives which the project was designed to achieve. The Administrator requested that the Secretary concur in these final decisions. On December 30, the Secretary did so concur.

On December 30 the Secretary executed an affidavit in which he stated that he concurred in the December 29 Action Memorandum from the Administrator and confirmed the Administrator's prior approval of the demonstration project pursuant to 42 U.S.C. § 1315, and the Administrator's determination that the conditions set forth in the November 24 approval letter had either been satisfied in full or that their satisfaction could properly be delayed.[2]

■ After consideration of all four documents—the Action Memorandum of Octo-ber 24, the November 24 letter from Pembleton to Parham, the December 29 Action Memorandum, and the Secretary's affidavit, the Court concludes that the Georgia proposal has received the appropriate final federal approval. The Court considers the belated Departmental action in issuing the December 29 Action Memorandum and the affidavit of the Secretary as evidence that the Secretary has made the essential judgment required of him under section 1115— that the project is likely to assist in achieving the objectives of the Act. While these actions are belated and many of the problems in this case might have been obviated if the Secretary had only articulated his position somewhat earlier, which he now has, the Court is unwilling to construe that belated action as constituting more than an elaboration of his earlier judgment and, particularly, it is unwilling to construe that belated rationalization, if so it be, as evidence of improper motives or action on the part of the Secretary.

### Preliminary Injunction Tests

■ In weighing any request for preliminary injunction, this Court must be guided by the standards set forth by the United States Court of Appeals for the Fifth Circuit in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567 (1974). The Court of Appeals there noted that, although the granting of a preliminary injunction is discretionary, the district court must exercise that discretion in the light of four prerequisites:

"The four prerequisites are as follows: (1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunc-

---

2. Because of a clerical error in the last paragraph of the December 29 Memorandum, condition number 2 (as numbered in the November 24 approval letter) was erroneously listed as having been satisfied; however, as is evident from the full context of the December 29 Action Memorandum as well as paragraph 7 of the affidavit of the Secretary, this Court finds that this reference to condition 2 should have been and was intended to be to condition 3.

tion will not disserve the public interest." (Citation omitted.) 489 F.2d, at 572.

The Court of Appeals has also stressed the extraordinary character of such relief:

"In considering these four prerequisites, the court must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion. The primary justification for applying this remedy is to preserve the court's ability to render a meaningful decision on the merits." *Id.* (Citation omitted.)

Those standards are set forth in recognition of the fact that the district court must decide whether to grant the interim relief of a preliminary injunction without the benefit of full discovery and consideration of the issues on the merits that would occur at trial. Based on a consideration of these factors, the Court finds that plaintiffs have not met these four essential requirements and, therefore, the Court must deny plaintiffs' motion for preliminary injunction.

1. *Likelihood of success on the merits*

■ Section 1115 of the Social Security Act, 42 U.S.C. § 1315, vests in the Secretary broad power to authorize projects which do not fit within the permissible statutory guidelines of the standard public assistance programs. *Aguayo v. Richardson*, 352 F.Supp. 462 (S.D.N.Y.), *aff'd*, 473 F.2d 1090 (2d Cir.), *cert. den.*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1973); *California Welfare Rights Organization v. Richardson*, 348 F.Supp. 491 (N.D.Cal.1972); H.R.Rep.No. 1414, 87th Cong., 2d Sess. (1962); S.Rep.No. 1589, 87th Cong., 2d Sess. (1962), U.S.Code Cong. & Admin.News 1962, p. 1943. The only limitation upon the Secretary's authority under section 1115 is that he must judge the project to be one which is likely to assist in promoting the objectives of the applicable title of the Act. *Id.* Congress has entrusted this judgment to the Secretary and not to the courts. *Id.*

■ Thus, once a project has been approved by the Secretary, it is the function of the courts only to determine whether his decision was arbitrary and capricious and lacking in rational basis. *See Aguayo v. Richardson*, 473 F.2d, at 1103; *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). That review is to be based on the record used by the decision-maker. *Id.* Therefore other factors or opinions not considered by him in approving the project would not be relevant.

■ Given the large degree of judgment vested in the Secretary with respect to the approval of section 1115 projects, it is not for the courts to deny the Secretary the right to approve a project merely because the Court might in certain situations disagree with his judgment. That judgment is committed to the Secretary and must be sustained as long as he exercises it within the confines of the statute. And, as the case law shows, the only prerequisite to the exercise of that authority is that in the Secretary's judgment the demonstration or experiment furthers the objectives of the appropriate title of the Act, in this case Title XIX. *Aguayo v. Richardson, supra; CWRO v. Richardson, supra.* The Secretary has made that judgment with respect to the Georgia project.

■ In view of that wide discretion, an attack upon the Secretary's authority faces a very grave obstacle. The Court has considered the arguments and the materials before it which go basically to the lack of good faith of the defendants in proposing and authorizing the waiver. Such an attack, going almost to the personal motives of the parties involved, would be a particularly difficult type of attack to mount successfully. Based on the evidence presented to it, the Court is unable to find that there is a substantial likelihood that the plaintiffs will prevail on the merits.

2. *Irreparable harm to the plaintiffs*

■ In considering the question of irreparable injury to the plaintiffs, the Court is mindful that all section 1115 approvals may well have a severe effect upon the people involved since those individuals constitute

the most vulnerable sector of our population. The Court is certain that there will be injury of one kind or another. For the most part, injury which is measured in dollar amounts does not constitute irreparable injury for purposes of a preliminary injunction. Consequently, the Court must look beyond the injury to the plaintiffs measured in terms of the co-payments they must make, and focus upon the denial of uses to which the funds used to make co-payments might entail. The Court is quite certain that there might be some instances in which less necessary medical treatment or less food is consumed by someone who used the money to make a co-payment. While recognizing that there very well may be some such effect, however, the Court nevertheless believes that the evidence on that point is too speculative to sustain the issuance of a preliminary injunction, particularly in view of the circumstances and types of medical care exempted from imposition of co-payment under the project.

Moreover, the Court must assume that the public officials charged with the administration of the Medicaid program in Georgia will perform their duty under the project and weigh the various problems involved, and believes that the exemption of medically dangerous situations and other matters from the co-payment requirements indicates a concern to reduce to a minimum the injury which any member of the class will suffer.

Finally, with respect to any injury, the Court notes that the limitation of the experiment to a temporary period only, would seem to reduce to a minimum any injury to the class.

For these reasons, the Court is unable to find that there is a substantial threat that plaintiffs will suffer irreparable injury if the injunction is not granted.

### 3. *Public Interest*

It is clear that the Medicaid program has important cost considerations. The incurring of excess costs with respect to one phase of the Medicaid program may very well mean a reduction of the program in another area. The public purse, both that of the state and even of the United States, is not absolutely unlimited. Accordingly, public officials must make some effort to provide the greatest good possible at the least possible costs. That appears to be the underlying motive behind this project, and it is one to be commended, and not one to be criticized. The Court believes that the public officials involved are attempting to act in the public interest and that it would disserve the public interest to enjoin them.

### 4. *Balancing of Interests*

Considering the public interest involved and weighing it against the threatened injury to the plaintiffs, the Court concludes that the potential harm to plaintiffs does not outweigh the threatened harm to the defendants. The Court thus concludes that the plaintiffs have failed to sustain their burden of persuasion in this case by failing to meet all, or indeed any, of the four prerequisites set out in *Canal Authority v. Callaway.* Accordingly, plaintiffs' request for a preliminary injunction is denied.

The Court also rules that the Secretary's motion for summary judgment is denied.

Finally, as a further control, the Court will attempt to expedite the final trial of this case, if that should prove to be necessary. To that end, having heard the description of the memoranda sought by the plaintiffs, the Court directs the federal defendants to turn over to the plaintiffs the following eight items of documents:

1. Memorandum to Morrill from Murray, dated September 18, 1975;

2. Memorandum to Altman from Harlan, dated September 30, 1975;

3. Note to the Secretary from Altman, dated October 3, 1975;

4. Memorandum to Lariviere from Smyth, dated October 3, 1975;

5. Note to Lariviere from Murray (undated);

6. Memorandum to Lariviere from Speigleblatt;

7. Memorandum to Lariviere from Reid, dated October 3, 1975;

8. Notes and records of the following meetings:

(a) Meeting between the Secretary and Governor Busbee on August 29;

(b) Meeting between the Secretary and Governor Busbee on August 29;

(c) Meeting between Thurmond, Bellows, and SRS staff in Washington on September 3; and

(d) Meeting between Morrill, Bellows, and SRS staff on September 18.

SO ORDERED, this 5 day of February, 1976.

## ON MOTION FOR TEMPORARY INJUNCTIVE RELIEF

Plaintiffs in the instant action seek injunctive relief until such time as the final trial on a permanent injunction is held. On December 23 and 31 a hearing was held on plaintiffs' motion for a preliminary injunction. At the close of the hearing on December 31 the Court verbally denied plaintiffs' motion and did the same by written order dated February 5, 1976.

Plaintiffs now claim that the ten "severely needed services" which the state defendant was required to identify by February 1, 1976, although identified, have not been approved by the federal defendant and, therefore, the Georgia co-payment project cannot proceed. Furthermore, plaintiffs claim that the ten severely needed services that have been identified by the state defendant are inappropriate to the co-payment experiment inasmuch as they are essentially identical to the life endangering service excluded from the co-payment project.

Defendants argue that identification of the ten severely needed services is required but not approval by defendant HEW. Moreover, defendants claim that such identification is merely for statistical purposes and is not a legal prerequisite to the continuation of the Georgia co-payment project. Defendants further contend that any overlapping among the ten severely needed services and the life endangering services is immaterial.

In addition, plaintiffs reassert the irreparable injury which they and the class they represent will suffer if the co-payment project is permitted to continue.

The Court finds that injunctive relief is not appropriate at this time. However, the Court desires that the case be resolved as expeditiously as possible and, therefore, sets the trial for a permanent injunction for February 23, 1976.

Accordingly, plaintiffs' motion for injunctive relief is hereby ORDERED DENIED.

SO ORDERED, this 9 day of February, 1976.

## ON MOTION FOR PERMANENT INJUNCTION

This is a proposed class action, brought by recipients of Medicaid in the State of Georgia, challenging an experimental project entitled "Recipient Cost Participation in Medicaid Reform" [hereinafter referred to as the Co-payment Project], undertaken by the State of Georgia in connection with its Medicaid Program under Title XIX of the Social Security Act of 1935, as amended, 42 U.S.C. § 1396 et seq. Jurisdiction over defendant Mathews is founded under 5 U.S.C. § 701 et seq., and over the state defendants pursuant to 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 1983. In addition, plaintiffs assert jurisdiction for declaratory relief under 28 U.S.C. §§ 2201, 2202.

On December 4, 1975, the Court temporarily restrained the defendants from commencing the co-payment project. On December 31, 1975, the Court denied plaintiffs' motion for a preliminary injunction and the co-payment project commenced soon thereafter. See Order dated February 5, 1976. A trial was had on February 23, 24, 25, 1976, and the case is now before the Court for final disposition. Plaintiffs seek to permanently enjoin operation of the Georgia co-payment project.

 As a preliminary matter the Court hereby GRANTS plaintiffs' motion for class certification, the class consisting of all current and future recipients of Medicaid in the State of Georgia with the exclusion of

foster child recipients of Aid to Families with Dependent Children under Title IV of the Social Security Act. See Fed.R.Civ.P. 23(b)(2). The Court also GRANTS plaintiffs' motions to amend complaint filed February 9 and 17, 1976.

A discussion of the pertinent provisions of the Social Security Act and of the Georgia co-payment project is found in the Court's Order of February 5, 1976. In summary, the co-payment project purports to be an attempt to demonstrate the effectiveness of recipient financial participation in the costs of certain medical care provided under the Georgia Medicaid Program. The plaintiff class consists of individuals defined as the "categorically needy," 42 U.S.C. § 1396a(a)(10)(A), in the Georgia Medicaid Program who are entitled to certain "mandatory" medical services without cost. See 42 U.S.C. § 1396d(a). The statute specifically provides that the categorically needy may not be required to contribute to the costs of mandatory services under the Medicaid program. 42 U.S.C. § 1396a(a)(14).

While state requirements under Title XIX are mandatory upon the states, section 1115 of Title XI, 42 U.S.C. § 1315, provides that the Secretary may waive compliance with any of these requirements "[i]n the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of [Title XIX]." The State of Georgia has obtained a section 1115 waiver from the Secretary in order to proceed with the co-payment project which, in part, requires Georgia recipients of Medicaid to contribute a "co-payment" for certain mandatory Medicaid services otherwise exempted from co-payments by statute. There are three basic parts of the experiment—physician surveys, recipient surveys, and the actual imposition of the co-payment upon the recipient.

Plaintiffs' attack on the co-payment project is twofold. First, plaintiffs' attack defendant Mathews' approval of the section 1115 waiver contending that the Secretary acted beyond the scope of his authority and, furthermore, acted in an arbitrary and capricious manner. Second, plaintiffs contend that the provisions of 45 C.F.R. § 46, relating to the protection of human subjects in project activities funded by the Department of Health, Education and Welfare [HEW], are applicable to the Georgia co-payment project and that defendants have failed to comply with the requirements of that regulation.

*The section 1115 waiver.*

On February 5, 1976 the Court denied a motion for a preliminary injunction in this action based upon the likelihood that plaintiffs would not prevail on the merits of their attack upon the section 1115 waiver.[1] The Court stated:

"Section 1115 of the Social Security Act . . . vests in the Secretary broad power to authorize projects which do not fit within the permissible statutory guidelines of the standard public assistance programs. . . . The only limitation upon the Secretary's authority, under Section 1115 is that he must judge the project to be one which is likely to assist in promoting the objectives of the applicable title of the Act. . . . Congress has entrusted this judgment to the Secretary and not to the courts.

. . .

"Thus, once the project has been approved by the Secretary, it is the function of the courts only to determine whether his decision was arbitrary and capricious and lacking in rational basis . . . .. That review is to be based on the record used by the decision-maker. . . . Therefore other factors or opinions not considered by him in approving the project would not be relevant.

"Given the large degree of judgment vested in the Secretary with respect to the approval of section 1115 projects, it is not for the courts to deny the Secretary

---

1. The claim regarding 45 C.F.R. § 46, the protection of human subjects regulation, was raised subsequent to the denial of the preliminary injunction. See Plaintiffs' Second Motion to Amend, February 17, 1976.

the right to approve a project merely because the Court might in certain situations disagree with his judgment. That judgment is committed to the Secretary and must be sustained as long as he exercises it within the confines of the statute. And, as the case law shows, the only prerequisite to the exercise of that authority is that in the Secretary's judgment the demonstration or experiment furthers the objectives of the appropriate title of the Act, in this case Title XIX. . . . The Secretary has made that judgment with respect to the Georgia project.

"In view of that wide discretion, an attack upon the Secretary's authority faces a very grave obstacle. The Court has considered the arguments and the materials before it which go basically to the lack of good faith of the defendants in proposing and authorizing the waiver. Such an attack, going almost to the personal motives of the parties involved, would be a particularly difficult type of attack to mount successfully. Based on the evidence presented to it, the Court is unable to find that there is a substantial likelihood that the plaintiffs will prevail on the merits." (citations omitted)

▉ Having again reviewed the voluminous record in this case and after hearing three days of oral argument on this issue, the Court finds that plaintiffs have failed to show that defendant Mathews abused his discretion in approving the section 1115 waiver. In the absence of any clear abuses of discretion by the Secretary, the Court will not disturb defendant Mathews' decision in this matter.

45 C.F.R. § 46.

The applicability and underlying policy of the regulations governing the protection of human subjects is set forth at 45 C.F.R. §§ 46.101(a), 46.102(a):

"The regulations in this part are applicable to all Department of Health, Education and Welfare grants and contracts supporting research, development, and related activities in which human subjects are involved.

\* \* \* \* \* \*

"Safeguarding the rights and welfare of subjects at risk in activities supported under grants and contracts from DHEW is primarily the responsibility of the institution which receives or is accountable to DHEW for the funds awarded for the support of the activity. In order to provide for the adequate discharge of this institutional responsibility, it is the policy of DHEW that no activity involving human subjects to be supported by DHEW grants or contracts shall be undertaken unless an Institutional Review Board has reviewed and approved such activity, and the institution has submitted to DHEW a certification of such review and approval, in accordance with the requirements of this part."

The provisions of 45 C.F.R. § 46 are designed to regulate institutional grantees which receive HEW funds for, or in connection with, research projects involving human subjects. The regulations only apply if a determination is made that the project in question involves human subjects. Although the regulations do not explicitly state who is to make the initial decision as to whether human subjects are involved, it appears from the regulations and the testimony at trial that the initial determination is made by the institution submitting the project application, subject to review by the Secretary of HEW. See 45 C.F.R. § 46.-111(b); transcript of testimony of Dr. Donald Chalkley at hearing held on February 25, 1976, pp. 17–20 [hereinafter Chalkley, T.R.].

If human subjects are involved, the institutional applicant must submit to HEW, prior to any undertaking of the project, a certification by its Institutional Review Board [IRB][2] that the IRB has reviewed

---

**2.** An institution which conducts HEW-supported projects is required to "assure" HEW that an IRB has been constituted to review proposed HEW-supported projects involving human subjects and to further carry out the requirements of the regulations. 45 C.F.R.

the project, determined whether the project places human subjects at risk, and approved the project. 45 C.F.R. §§ 46.102(a), (b), 46.111(a). The review by the IRB must determine at the outset whether human subjects will be placed at risk by the proposed project.[3] 45 C.F.R. § 46.102(b). If risk is involved, the IRB must determine whether (1) the risks to the subject are so outweighed by the sum of the benefit to the subject and the importance of the knowledge to be gained as to warrant a decision to allow the subject to accept these risks; (2) the rights and welfare of any such objects will be adequately protected; and (3) legally effective informed consent will be obtained by adequate and appropriate methods in accordance with the provisions of the regulations. 45 C.F.R. § 42.102(b)(1), (2), and (3).

If the institution submitting the project application to HEW certifies that the project does not involve human subjects then the regulations are by-passed, subject to HEW's review of that certification.

With regard to Georgia's co-payment project, the Georgia Department of Human Resources submitted to the Social and Rehabilitation Service [SRS] of HEW an application for a section 1115 waiver accompanied by the departmental certification that human subjects were not involved in the proposed project. Defendant Mathews, acting through SRS, approved this certification.

■ The question presently before the Court is: Are human subjects involved in the Georgia co-payment project in such a way as to trigger the provisions of 45 C.F.R. § 46? The Court need not determine whether the subjects are at risk; this is a determination to be made by the IRB, only after a determination is made that human subjects are involved.

The difficulty with the regulation in question is that, on its face, the language is broad and general, and the provisions themselves do not define the critical terminology—neither "grants and contracts supporting research, development, and related activities" nor "human subjects" is defined.

The state defendant argues, that any project approved under a section 1115 waiver is not subject to the protection of human subject regulations. The state defendant claims that the language of § 46.101(a), which states that the regulation is applicable to "grants and contracts supporting research, development, and related activities" is not co-extensive with the language of section 1115 providing for Secretarial authorization of "experimental, pilot, or demonstration project[s]." Moreover, the defendants cite § IV–8432 of the *Handbook of Public Assistance Administration* [hereinafter *Handbook*] which provides:

> "In enacting section 1115, Congress did not include 'research' projects. This omission emphasizes the focus on action or operational innovation rather than basic research or fact-finding studies or surveys."

Nevertheless, in the Action Memorandum from the Acting Administrator of SRS, and the Acting General Counsel, to the Secretary of HEW, filed with the Court on March 22, 1976, by defendant Mathews, it appears that defendant Mathews does not wholly agree with the state defendant. The Action Memorandum states as follows:

> "It would seem . . . that in the usual and customary sense in which these terms are used, § 1115 projects might well be considered 'research,' 'development' or 'related activities.'

> "Despite the *Handbook*'s disclaimer of the nature of § 1115 projects as 'research,' however, it appears to be the general SRS understanding that these projects at least fall broadly within the purview of the term 'research,' and indeed § 1115 projects would seem to fit dictionary definitions of the term. . .

---

§§ 45.105(a), 45.106(b). The Georgia Department of Human Resources has such an approved assurance on file with HEW.

3. "Subject at risk" is defined at 45 C.F.R. § 46.-102(b).

"Moreover, elsewhere in § 8432 of the *Handbook* a description of the types of projects encompassed under § 1115 suggests that § 1115 projects might well be considered 'research' within at least the dictionary sense of that term. . . .

". . . [C]ertain elements of a research project are part and parcel of any § 1115 project."

Although defendant Mathews indicates that there is support for both positions, it appears from the Action Memorandum that the more reasonable interpretation favors the inclusion of section 1115 projects within the scope of the protection of human subject regulations. Further support for this conclusion is found in defendant Mathews' decision that part of the Georgia co-payment project—physician and recipient surveys—must be submitted to the IRB in accordance with the regulations.

The state defendant further claims that the protection of human subjects regulation was promulgated pursuant to an express statutory command under an amendment to the Public Health Service Act, 42 U.S.C. § 289*l*–3. The scope of that amendment is specifically limited to biomedical and behavioral research projects involving human subjects which fall under the Public Health Service Act. Programs under the Social Security Act are not covered by this amendment. However, this contention is without merit inasmuch as the regulations were promulgated only in part pursuant to authority in the Public Health Service Act. The regulation applies to *all* HEW-supported activities as defined at § 46.101. With the exception of the Public Health Service Programs, the regulations have been promulgated pursuant to the Secretary's broad rulemaking authority, rather than pursuant to any express terms of a specific statutory mandate. See Federal Defendant's Response, p. 2, May 5, 1976. Moreover, there is no specific requirement or exemption in either section 1115 or the protection of human subjects regulation as to the applicability of the regulation to section 1115 projects. Defendant Mathews specifically states in the March 22 Action Memorandum that HEW "has never resolved the question whether § 1115-type projects should be included within the purview of 45 C.F.R. Part 46 . . . although of late it has begun to give consideration to their applicability in projects involving medical care" and has determined that parts of the Georgia co-payment project, physician and recipient surveys, are within the scope of the regulations.

Accordingly, the Court finds that the protection of human subjects regulation may be applicable to a section 1115 project. However, the second, and more difficult inquiry with respect to the application of the protection of human subjects regulations to the Georgia co-payment project is the scope of the term "human subjects" in 45 C.F.R. § 46.101(a). Although "human subjects" is not defined in the regulations, "subject at risk" is defined as:

". . . any individual who may be exposed to the possibility of injury, including physical, psychological, or social injury, as a consequence of participation as a subject in any research, development, or related activities which departs from the application of those established and accepted methods necessary to meet his needs, or which increases the ordinary risks of daily life, including the recognized risks inherent in a chosen occupation or field of service." 45 C.F.R. § 46.-103(b).

Defendant Mathews, although conceding that a determination of whether individuals are human subjects and whether they are subjects at risk are totally separate issues, attempts to avoid application of the regulations to the co-payment project by arguing that Georgia Medicaid recipients are not placed "at risk" by the co-payment project. Such an argument is unsound. The Court need not, and will not, determine if the co-payment project places human subjects at risk, but only whether the co-payment project involves human subjects. Such a conceptual distinction is clear from the face of the regulations. Indeed, the history of the regulations does not support defendant Mathews' method of determining whether

human subjects are involved by determining if they are at risk. HEW specifically rejected an original proposal which provided that the regulations be applied only to "activities in which human subjects may be at risk." 38 Fed.Reg. 27882 (October 9, 1973). The adoption of the present language—"activities in which human subjects are involved"—is evidence of HEW's intent that the determination of whether human subjects are involved is to be carried out without reference to the question of risk.

At trial, defendant Mathews offered the testimony of Dr. Donald T. Chalkley, Director of the Office for Protection from Research Risks, Office of the Director, National Institutes of Health, Public Health Service, Department of Health, Education and Welfare. Dr. Chalkley is charged with the administration of the protection of human subjects regulation and is one of the drafters of the regulation. The definition of human subjects offered by Dr. Chalkley, which has not been disputed by any of the parties, is an individual "who is deliberately and personally imposed upon." Chalkley T.R. 9. With this definition in mind, Dr. Chalkley testified that the aspects of the Georgia co-payment project involving physician and recipient surveys were covered by the protection of human subject regulations. Defendant Mathews has agreed with this determination and directed that this part of the project be submitted to the IRB. The March 22 Action Memorandum states that "survey instruments designed to test attitudes may have psychological impact upon the interviewees by, for example, inducing in them a sense of shame, guilt, embarrassment, or other emotional reaction." The Memorandum goes on to state that the interviewees are likely to be subjects at risk.[4]

Yet Dr. Chalkley and defendant Mathews claim that the imposition of the co-payment does not involve human subjects because, first, it does not place individuals "at risk" and, second, it imposes only financial risks

upon individuals and the regulation was not designed to cover fiscal burdens.

However, whether the co-payments place individuals at risk is not material to the issue presently before the Court. Furthermore, to find that the surveys are within the scope of the regulations because the interviews may have a psychological impact upon the interviewees, but that the actual imposition of co-payments are not within the scope of the regulations defies logic. Certainly the imposition of co-payments, which financially burden recipients defined as the categorically needy in the Georgia Medicaid Program, may inhibit such individuals from seeking necessary medical services. The Georgia co-payment project has the effect of diminishing the amount of money that a family might have available for basic living needs and forces the family to make a determination whether to apply that money to basic living needs or to apply it to purchase medical care. Such an activity in which human beings, defined in the Social Security Act as the categorically needy, are required to pay for medical care in a situation in which they could not otherwise be statutorily required to pay for such care and would not otherwise have to apply income to that need, is an activity which "deliberately and personally imposes" upon those human beings. See Chalkley T.R. 39.

The regulations must be read and applied consistently. Based upon the testimony of Dr. Chalkley and the conclusions of defendant Mathews in the March 22 Action Memorandum it appears that human subjects are involved in the co-payment aspect of the Georgia co-payment project.

The Court notes that Dr. Chalkley later expanded upon his definition of human subjects, stating that the individual must also be exposed to some method that is not standard and accepted in meeting the individual's deeds. Chalkley T.R. 54. Such a definition is akin to the meaning of "subject at risk" which, as has already been discussed, is conceptually distinct from "hu-

---

4. The physician and recipient surveys have been submitted to the Georgia IRB which found that the recipient surveys potentially placed

human subjects at risk. The IRB made several recommendations which have been instituted by the State of Georgia.

man subject." However, even under this expanded definition it appears that the imposition of co-payments involves human subjects. The standard and accepted method for obtaining certain "mandatory" medical services, as defined in Title XIX, for the categorically needy in Georgia is by statutory prohibition of any payment for those services by the individual recipient. Requiring a co-payment exposes these individuals to a method which is not standard or accepted in meeting their needs. See *Institutional Guide to DHEW Policy on Protection of Human Subjects*, pp. 3–4, cited in defendant Mathews' Action Memorandum, pp. 9–11, March 22, 1976.

Today's holding does not mean that any experimental government program or demonstration project designed to test whether a particular fee or tax or sanction would bring about a salutary change in behavior patterns of the affected members of the public would come within the purview of these regulations, as defendant Mathews asserts. First, the regulations are only applicable to HEW-supported projects. Second, the projects must involve grants and contracts supporting research, development, and related activities in which human subjects, as defined above, are involved. Once this threshold is crossed the only requirement imposed by the regulation is that the project be submitted to an Institutional Review Board for examination. If, at the outset, the IRB determines that human subjects are not "at risk," as defined in the regulation, then there is nothing further in the regulation with which the institution submitting the project must comply.

■ Defendant Mathews further claims that application of the regulation to section 1115 projects will have the effect of precluding the Secretary from conducting any section 1115 projects which involve diminution of benefits inasmuch as the regulation requires that informed consent be obtained from each affected individual. However, the regulation requires such consent only from individuals determined to be subjects at risk, 45 C.F.R. § 46.109. If an IRB determines that a section 1115 project does involve subjects at risk then this is the very class of persons that the protection of human subjects regulation is designed to protect. Moreover, it is not impossible to devise certain incentives to encourage the necessary number of individuals for an experimental sample to consent to participate in a section 1115 project involving diminution of benefits.

■ The principle which accords substantial weight to an agency's interpretation of its own regulation is inapplicable insofar as that interpretation is inconsistent with the requirements of the regulation and inconsistent with other interpretations of the regulation by the same agency. See *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *Francis v. Davidson*, 340 F.Supp. 351, 368 (D.Md.), aff'd, 409 U.S. 904, 93 S.Ct. 223, 34 L.Ed.2d 168 (1972); *Barron v. Saucier*, Civil Action No. 17159 (N.D.Ga. Sept. 27, 1973).

Accordingly, the state defendant's motion to dismiss, filed February 20, 1976, is hereby ORDERED DENIED. The plaintiffs' motion for a permanent injunction is hereby ORDERED GRANTED to become effective forty-five (45) days from the date of this Order if the following conditions have not been met by the defendants: The remaining portion of the Georgia co-payment project which has not been submitted to the Institutional Review Board must be so submitted for the purposes set forth at 45 C.F.R. § 46.102(b). Furthermore, the IRB must review the project, make any recommendations necessitated by such review, and the state defendant must act upon those recommendations, if any are made, within the 45-day period.