Deanna BENO; Susan Wiseman; Jody Baker; Janese Denise Bland; Reina Weight; Susan Clark; Tawab Popal, Plaintiffs–Appellants,

v.

Donna SHALALA, Secretary, United States Department of Health and Human Services; Mary Jo Bane *, Assistant Secretary, Administration for Children and Families; Bruce Vladeck,** Administrator, Health Care Financing Administration; Russell Gould, Secretary, California Health and Welfare Agency; Eloise Anderson, Director, California Department of Social Services; Thomas Hayes, Director, California Department of Finance, Defendants–Appellees.

No. 93–16411.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1994.

Decided July 13, 1994.

---

\* Mary Jo Bane is substituted for her predecessor, Jo Anne Barnhart, as Assistant Secretary, Administration for Children and Families, pursuant to Fed.R.App. P. 43(c)(1).

\*\* Bruce Vladeck is substituted for his predecessor, William Toby, Jr., as Administrator, Health Care Financing Administration, pursuant to Fed. R.App. P. 43(c)(1).

Melinda Bird and Clare Pastore, Western Center on Law and Poverty, Los Angeles, CA, for plaintiffs-appellants.

Edward T. Swaine, U.S. Dept. of Justice, Washington, DC, for federal defendants-appellees; and Eileen Gray and Theodore Gar-

elis, Deputy Attys. Gen., Sacramento, CA, for state defendants-appellees.

Vicki Michel, Pacific Center for Health Policy and Ethics, University of Southern California Law Center, Los Angeles, CA, for amicus.

Before: GOODWIN, NORRIS, O'SCANNLAIN, Circuit Judges.

Opinion by Judge GOODWIN; Dissent by Judge O'SCANNLAIN.

GOODWIN, Circuit Judge:

Plaintiffs, California residents who receive Aid to Families with Dependant Children ("AFDC"), appeal the denial of their request for a preliminary injunction enjoining California's public benefits experiment, 853 F.Supp. 1195. Plaintiffs object to a state-wide benefits cut enacted as part of an experimental work-incentive project and challenge the Secretary of Health and Human Services' ("Secretary of HHS")[1] waiver of certain federal laws related to the project. They argue that the Secretary's waiver violates the Administrative Procedures Act, ("APA"), 5 U.S.C. § 701 *et seq.* and § 211 of the HHS Appropriations Act, 42 U.S.C. § 3515b, which prohibits HHS from spending federal money on experimental projects which pose a danger to human research subjects without their informed consent. In addition, they contend that California's project violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–12213, by failing to make reasonable accommodations for AFDC recipients with disabilities. We reverse.

## I. CALIFORNIA'S PROGRAM

The benefits cut at issue in this appeal is part of a five-year Assistance Payments Demonstration Project ("APDP") enacted at Cal.Welf. & Inst.Code § 11450.01 *et seq.* APDP includes both a "residency requirement" and a "work-incentive" program. The

---

1. We refer throughout this opinion to the current Secretary as convention provides, although all material decisions were made by her predeces-

sors and the waiver was actually approved by Assistant Secretary of AFDC.

former, which has been preliminarily enjoined on constitutional grounds, aims to discourage poor families from moving to California by limiting recent entrants' AFDC benefits to the amount received in their state of former residence. *See Green v. Anderson,* 811 F.Supp. 516 (E.D.Cal.1993), *aff'd,* 26 F.3d 95 (9th Cir.1994). The latter, which is the subject of this appeal, aims to encourage AFDC recipients to find work by decreasing benefits and allowing recipients to keep more of their earned income.[2]

The work-incentive benefits cut affects all California AFDC families (approximately 826,000 families and 2.4 million persons, ER 367) without regard to family composition or disabilities,[3] except for a "control group" of 5,000 families randomly selected from four counties. The control group receives AFDC benefits at their former levels and is subject to the old income-disregard rules. In order to assess the impact of the work-incentive program, the state plans to compare data about these control group families with data on 10,000 families randomly selected from the same four counties. The state does not plan to study most of the other approximately 800,000 families affected by the cut.

## II. THE FEDERAL WAIVERS

The benefits program at issue, AFDC, is a cooperative federalism program created by the Social Security Act of 1935, 42 U.S.C. §§ 601–687. Participating states and the federal government jointly finance the program and state governments administer it under plans approved by the Secretary of Health and Human Services. *Id.* While states are not required to participate, participating states must comply with a variety of federal requirements. *Alexander v. Choate,* 469 U.S. 287, 289 n. 1, 105 S.Ct. 712, 714 n. 1, 83 L.Ed.2d 661 (1985); *Rosado v. Wyman,* 397 U.S. 397, 417, 90 S.Ct. 1207, 1220, 25 L.Ed.2d 442 (1970).

California concedes that APDP violates several of these requirements, including the "Maintenance of Effort" requirement of 42 U.S.C. § 1396a(c)(1).[4] This section provides that:

> the Secretary shall not approve any State plan for medical assistance if—(1) the state has in effect [AFDC] payment levels that are less than the payment levels in effect under such plan on May 1, 1988.

42 U.S.C. § 1396a(c)(1). California's experiment reduces AFDC benefits to below their May 1988 levels. Thus, absent a waiver, the state could not implement the experiment without jeopardizing federal funding of its $14 billion Medicaid program. The California statutes enacting APDP, therefore, refer explicitly to obtaining HHS approval, and do not become effective until thirty days after state officials receive such approval.[5]

On September 9, 1992, California officials applied to HHS for a waiver of these various federal laws, pursuant to the Secretary's au-

---

**2.** Specifically, the Project reduces the 1992 Maximum Aid Payments ("MAP") (i.e. the benefits) provided to needy families, but retains the 1992 Minimum Basic Standard of Adequate Care ("MBSAC") (with cost of living adjustments in 1992–96). Cal.Welf. & Inst.Code § 11452. Families are permitted to "fill the gap" between the MAP and the MBSAC by working and keeping their earnings as long as their total income does not exceed the MBSAC.

**3.** Thus, the "work-incentive" benefits cut will affect not only AFDC families headed by "able-bodied" adults, but also families headed by adults who cannot work because of their disabilities and "child-only" AFDC families which contain no adult recipient.

**4.** APDP also conflicts with (1) federal rules prohibiting states from basing AFDC benefits on the length of state residency; (2) federal income-disregard rules, including the "100 hour rule"

which prohibits AFDC recipients from working more than 100 hours a month, 45 C.F.R. §§ 233.-100(a)(1)(i), 233.100(c)(1)(iii) and the "thirty dollars and one-third earnings disregard" which restrict AFDC recipients' ability to retain earned income without losing benefits, 45 C.F.R. §§ 233.20(a)(11)(i)(D), 233.20(a)(11)(ii)(B); and (3) rules requiring states to provide uniform benefit payments statewide.

**5.** *See, e.g.,* Cal.Welf. & Inst.Code § 11450.01(b) (state officials "shall seek the approval from [sic] the United States Department of Health and Human Services that is necessary to reduce the maximum aid payments specified in subdivision (a).... The reduction provided by this subdivision shall be made on the first day of the month following 30 days after the date of [HHS] approval.").

thority under 42 U.S.C. § 1315(a), which provides that:

> In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of subchapter I, X, XIV, XVI or XIX or this chapter, or Part A or D of subchapter IV of this chapter [the AFDC program], in a State or States—
>
> (1) the Secretary may waive compliance with any of the requirements of section 302, 602, 654, 1202, 1352, 1382 or 1396a of this title, as the case may be, to the extent and for the period he finds necessary to enable such State or States to carry out such project.

California's waiver application alleged that the instant benefits cut would promote the objectives of the Act by creating a "work-incentive" experiment, which would "encourage able-bodied adults" to find work. ER 1167. The state requested authority to make unlimited benefits cuts, and contended that the experiment would help determine whether such work-incentives could be effective in other states. *Id.*

The state's application did not address the cut's effect on AFDC recipients with disabilities or on child-only families, who could not respond to the work incentive. Nor did it explain why the state had decided to cut benefits to all families in order to study the response of a few recipients in four counties or offer any data about the cut's potential impact on children or low-income families. Rather, it emphasized that the experiment will "save $420 million annually ($208 million federal, $202 million state and $10 million county, with administrative costs taken into account)" and asked HHS to take quick action on the waiver because "[g]iven the current fiscal condition of the State and Federal governments, it is imperative that these reforms be implemented as soon as possible." ER 1167.

On September 29, 1992, less than two weeks after receiving California's proposal, the Secretary faxed state officials a draft "Terms and Conditions" setting forth proposed conditions for approval of the experiment. The draft Terms and Conditions contains detailed provisions concerning "cost neutrality" (i.e. whether the experiment would increase federal expenditures) and data collection, but does not address the need for a statewide cut, the proposed cut's on children, or the need to cut benefits to disabled recipients and child-only AFDC units.

Plaintiffs' counsel wrote HHS, raising these and other issues and asking HHS to delay approval of California's project to enable plaintiffs to submit comments. HHS did not respond to this letter, but continued to exchange draft Terms and Conditions with California officials, adding various provisions about cancelling the program, federal funding, and data collection. The only change that addressed the project's potential impact on AFDC recipients was the Secretary's decision to limit the benefits cuts to 6.3% below 1988 levels. However, the Secretary gave no explanation for this figure and allowed the state to cut benefits to recent entrants by up to 80%.

On October 16, plaintiffs' counsel sent a second letter, objecting to the benefits cut and residency requirement and submitting voluminous materials about the harm the cut would cause AFDC families and children. Counsel also noted that California could create a work incentive without cutting benefits—by simply changing the income-disregard rules—and could limit the cut to those recipients whose disabilities did not preclude work. ER 1332. According to plaintiffs, such reforms could be implemented without increasing state and federal expenditures. *Id.* (stating that Michigan had enacted such a program).

HHS made its final editorial changes to the draft Terms and Conditions on the day it received plaintiffs' letter. These minor changes were not accompanied by any comment on plaintiffs' objections or proposed alternatives. The state also submitted no response to plaintiffs' comments. On October 29, after California submitted additional material on data collection, HHS granted California's waiver request.

California implemented the 1.3% cut authorized by the Secretary's waiver and Cal. Welf. & Inst.Code § 11450.01(b)(1) on De-

cember 1, 1992. Relying on the Secretary's waiver, the legislature then authorized an additional 2.7% cut, which went into effect on September 1, 1993. Cal.Welf. & Inst.Code § 11450.015. Because California had previously reduced AFDC benefits by 4.5% and 4.4%, California's AFDC benefits are now 4% below 1988 levels and some 11% below 1992 levels.[6] The governor has proposed additional cuts to be implemented July, 1994.

Shortly after the first cut went into effect, plaintiffs, who are AFDC recipients subject to the benefits cuts and residency requirements, filed this class action against various state and federal officials. They sought declaratory and injunctive relief and a preliminary injunction vacating the Secretary's waiver of the "maintenance of effort" requirement contained in 42 U.S.C. § 1396a(c)(1). Citing evidence that the proposed cut would inflict serious harm, including hunger and malnutrition, on low-income families and children, particularly given California's unemployment rates and high cost of living,[7] plaintiffs contended, inter alia, (1) that the Secretary's waiver was "arbitrary and capricious" within the meaning of the APA, 5 U.S.C. § 701 et seq.; (2) that the experiment presented a danger to human research subjects such that federal funds cannot be spent on the project without participants' informed consent, 42 U.S.C. § 3515b (§ 211); and (3) that California's failure to make reasonable accommodations for recipients with disabilities violates the ADA, 42 U.S.C. §§ 12131–12213.

The district court denied plaintiffs' motion for a preliminary injunction, finding that, while plaintiffs had shown "the possibility of irreparable harm," they had not shown that any of these statutory claims were "likely to succeed on their merits" or that the balance of hardships tipped in their favor. Dist. Ct. Order at 38–39 853 F.Supp. at 1204–05.[8] Plaintiffs timely appealed pursuant to 28 U.S.C. § 1292(a)(1).

## III. STANDARD AND SCOPE OF REVIEW

 In general, we review for abuse of discretion a district court order granting or denying a preliminary injunction. *Miller v. California Pac. Medical Ctr.*, 19 F.3d 449, 455 (9th Cir.1994) (en banc); *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 516 (9th Cir.1993), *cert. dismissed,* — U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994).[9] However, legal issues underlying the decision to grant or deny preliminary relief are reviewed de novo. *Miller*, 19 F.3d at 455; *Inland Empire Pub. Lands Council v. Schultz*, 992 F.2d 977, 980 (9th Cir.1993). Moreover, where the record is fully developed, the plaintiff "requested both preliminary and permanent injunctions on the issues being appealed, and the district court's denial of injunctive relief rested primarily on interpretations of law, not on the resolution of factual issues," we may "consider the merits of the case and enter a final judgment to the extent appropriate." *Sierra Club v. Marsh*, 816 F.2d 1376, 1382 (9th Cir.1987) (citing cases); *Friends of the Earth v. United States Navy*, 841 F.2d 927, 931 (9th Cir.1988).

Here, the district court found, and defendants concede, that plaintiffs have shown "the possibility of irreparable harm." Secr. Br. at 34, 853 F.Supp. at 1215.[10] Both plain-

---

**6.** *See* Cal.Welf. & Inst.Code § 11450.01 (reducing benefits by 4.5% as of Oct. 1, 1992). The 4.4% cut was implemented the previous year. These cuts are not at issue in this appeal, as they did not reduce benefits below 1988 levels.

**7.** *See* ER 269–311 (hunger studies), 207, 311 (housing studies), 363, 380, 381 (disability studies).

**8.** The district court also granted in part defendants' motion to dismiss and dismissed plaintiffs' 42 U.S.C. § 648 claim. Plaintiffs do not appeal this aspect of the court's order.

**9.** Moreover, in APA cases, a district court decision is "generally accorded no particular deference," *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1161 (9th Cir.1980), and is reviewed de novo "because the district court is in no better position than this court to review the administrative record." *Nevitt v. United States*, 828 F.2d 1405, 1406 (9th Cir.1987); *see also Great Western Bank v. Office of Thrift Supervision*, 916 F.2d 1421, 1426 (9th Cir.1990).

**10.** Numerous cases have held that reductions in AFDC benefits, even reductions of a relatively small magnitude, impose irreparable harm on recipient families. *See, e.g., Chu Drua Cha v. Noot*, 696 F.2d 594, 599 (8th Cir.1982) ("We

tiffs and defendants concede that the only significant disputes in the case are legal, and that the record is adequate to address plaintiffs' claims on their merits.[11] The "parties ask us to interpret statutes and regulations in determining whether the district court erred," *Sierra Club*, 816 F.2d at 1382, and "the district court's denial of injunctive relief rested primarily on questions of law." *Friends of the Earth*, 841 F.2d at 931. We therefore review de novo the district court's legal conclusions and address plaintiffs' claims on their merits.

## IV. PLAINTIFFS' APA CLAIM

Plaintiffs first contend that the Secretary's decision to waive California's compliance with the "Maintenance of Effort" requirement of 42 U.S.C. § 1396a(c)(1) is "arbitrary and capricious" and hence violates the APA, 5 U.S.C. § 706(2)(A). The Secretary counters (A) that plaintiffs lack standing to challenge the Secretary's waiver under the APA; (B) that § 1315(a) waivers are not subject to APA review; (C) that § 1315(a) does not require her to consider the issues plaintiffs raise; and (D) that the Secretary's decision was not "arbitrary and capricious" within the meaning of the APA. We address each of these arguments in turn.

### A. *Standing*

■ We review de novo the district court's determination that plaintiffs have standing. *Ellis v. City of La Mesa*, 990 F.2d 1518, 1523 (9th Cir.1993), *cert. denied*, — U.S. —, —, 114 S.Ct. 2707, —, 129 L.Ed.2d 834 (1994). To establish standing, a federal plaintiff must show (1) that he has suffered an "injury in fact"; (2) that there is a "causal connection between the injury and the conduct complained of"; and (3) that it is " 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Lujan v. Defenders of Wildlife*, — U.S. —, —, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (quoting *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)).

■ As the Secretary concedes, plaintiffs have obviously met the injury and causal-connection prongs of this test. However, the Secretary contends that plaintiffs have not shown redressibility because, in her view, the APA gives this court jurisdiction only to remand to the Secretary for further review and neither § 1396a(c)(1) nor any other federal law makes California's benefits cut illegal.[12]

---

have no doubt that irreparable harm is occurring to the plaintiff class as each month passes … [even if the 11th amendment would permit a court order requiring retroactive benefits payments, because] [f]or people at the economic margin of existence, the loss of $172 a month and perhaps some medical care cannot be made up by the later entry of a money judgment."), *mod. on other grounds*, 701 F.2d 750 (8th Cir.1983); *Banks v. Trainor*, 525 F.2d 837, 842 (7th Cir.1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976); *Smith v. Babcock*, 748 F.Supp. 501, 508–09 (E.D.Mich. 1990), *rev'd on other grounds*, 19 F.3d 257 (6th Cir.1994); *Gorrie v. Heckler*, 606 F.Supp. 368, 374 (D.Minn.1985) (subsequent history omitted); *Moore v. Miller*, 579 F.Supp. 1188, 1191–92 (N.D.Ill.1983) ("For those in the grip of poverty, living on the financial edge, even a small decrease in payments can cause irreparable harm."); *Williamson v. Gibbs*, 562 F.Supp. 687, 688 (W.D.Wash.1983); *RAM v. Blum*, 533 F.Supp. 933, 940 (S.D.N.Y. 1982); *Crane v. Mathews*, 417 F.Supp. 532, 539–40 (N.D.Ga.1976) (imposition of $2 copayment for medical treatment is irreparable injury to welfare recipients living at subsistence level); *Nelson v. Likins*, 389 F.Supp. 1234, 1237, 1242 (D.Minn. 1974) (loss of $80 to $100 a month in AFDC benefits is sufficient irreparable injury to justify a preliminary injunction and a denial of a stay of preliminary injunction pending appeal because "[w]hile the loss of money is normally not considered irreparable, … in this case those affected are not the average citizens but those in the grip of poverty."), *aff'd* per curiam, 510 F.2d 414 (8th Cir.1975); *cf. Paxton v. Secretary of Health and Human Servs.*, 856 F.2d 1352, 1354 (9th Cir.1988) ("When a family is living at subsistence level, the subtraction of any benefit can make a significant difference to its budget and to its ability to survive.").

11. Plaintiffs' APA claim requires a review of the administrative record, which is complete, and interpretation of relevant statutes; additional fact-finding is not necessary to resolve this claim. The record is also adequate to resolve plaintiffs' human subjects and ADA claims.

12. *See Stowell v. Ives*, 976 F.2d 65, 69 (1st Cir. 1992) (while 42 U.S.C. § 1396a(c)(1) obligates the federal government to take action, it gives the state a choice of either maintaining AFDC benefits or reducing them at the risk of losing federal funding).

Therefore, she alleges, a favorable decision of this court might not restore plaintiffs' benefits because (1) the Secretary might again grant California's request for a waiver; (2) California might elect to continue the experiment at the risk of losing federal Medicaid funding; and (3) California might be able to continue the experiment without losing federal Medicaid money by characterizing its future Medicaid funding submissions as "plan amendments" rather than as new plans. Secr. Br. at 13 n. 12.

These arguments suffice to show that a favorable decision *might* not redress plaintiffs' injury. However, to have standing, a federal plaintiff must show only that a favorable decision is *likely* to redress his injury, not that a favorable decision *will inevitably* redress his injury. *Lujan,* ── U.S. at ──, 112 S.Ct. at 2136.[13] Thus, the mere fact that, on remand, the Secretary might again issue a waiver does not defeat plaintiffs' standing. *See, e.g., Seattle Audubon Soc'y v. Espy,* 998 F.2d 699, 702 (9th Cir.1993) (In a suit challenging an Environmental Impact Statement (EIS), the fact that "redrafting the EIS might not change the Secretary's decision ... is not relevant to standing."); *Idaho*

*Conservation League v. Mumma,* 956 F.2d 1508, 1518 (9th Cir.1992) (same).

In this case, a favorable ruling is *likely* to redress plaintiffs' injury. First, the California statutes explicitly require state agencies to obtain HHS approval and do not become effective until thirty days after HHS gives such approval. Arguably, then, while a favorable decision of this court might not make California's benefits cut illegal under *federal* law, it might make it illegal under state law.[14] It might also prevent California from implementing additional cuts.

Second, in *Lujan* and other cases addressing redressibility, the decision-making agencies were "not parties to the suit and [were therefor not] obliged to honor an incidental legal determination" of the suit. *Lujan,* ── U.S. at ──, 112 S.Ct. at 2141.[15] However, in this case, the state decision-making agencies are parties to the action and will be bound by any legal conclusions this court or the district court may reach.

Finally, in contrast to *Simon* and *Lujan,* where invalidation of the contested decision would have only a minor effect on the relevant agencies' budget,[16] in the instant case, California stands to lose more than $14 billion in federal Medicaid funding.[17] The loss

**13.** *See also Family & Children's Ctr., Inc. v. School City of Mishawaka,* 13 F.3d 1052, 1058 (7th Cir.1994) ("[T]he plaintiff need not show absolutely that a favorable judgment will redress his injury; a 'probabilistic benefit from winning a suit' is adequate.") (*quoting North Shore Gas Co. v. EPA,* 930 F.2d 1239, 1242 (7th Cir.1991)).

**14.** State defendants' statements to this court and the district court support this interpretation of state law. *See* St.Br. at 1 ("The requested injunction *would have prevented* California from implementing a five-year experimental project.") (emphasis added); *Id.* (project *"required approval* by appellee Secretary"); St. Br. at 2 ("If plaintiffs prevail, and the decision of the District Court is reversed, California *will be prevented from continuing* [its] experimental project.") (emphasis added); St. Br. at 7 ("waiver *allowed* California to lower benefit levels.") (emphasis added); State Defs' Opp'n to Mot. for Prelim. Inj., at 2–3 (waiver "allowed a reduction in benefit levels"); *Id.* at 5, 31 ("reduction imposed by reason of the Secretary's waiver").

**15.** *See also ASARCO, Inc. v. Kadish,* 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989) (no standing when agency actually able to afford relief was not a party to the action and would not be bound by an order); *Marshall*

*Durbin Co. v. EPA,* 788 F.2d 1490, 1492 (11th Cir.1986) (same).

**16.** *See Lujan,* ── U.S. at ──, 112 S.Ct. at 2142 (Scalia, J., plurality opinion) (no standing to challenge federal agency's decision where federal agencies provide less than 10% of the funding for one of the challenged projects because it is "entirely conjectural" whether any change in agency activity would redress plaintiffs' injury); *Simon,* 426 U.S. at 43–44, 96 S.Ct. at 1926–27 (aggrieved patients lacked standing to challenge an IRS decision to accord favorable tax treatment to charitable donations to certain hospitals where such donations accounted for only 4% of the hospitals' funding and less favorable tax treatment would not necessarily induce the hospitals to change the contested policy). In both *Lujan* and *Simon,* the Court suggested that plaintiffs might have had standing had they shown that the challenged government action had a greater financial impact.

**17.** Plaintiffs do not indicate whether this figure represents California's total Medicaid budget or only the federal portion.

of such funds would have a very significant impact on California's budget. Given state defendants' own statements and the political and fiscal realities in California, we doubt that state agents would risk losing such funding in order to reduce AFDC benefits. State memoranda describing APDP consistently emphasize its potential fiscal savings. *See, e.g.,* ER 1167 (noting that the project could save $202 million in state funds and $10 million in county funds). Giving up $14 billion in order to save $202 million simply does not make sense, fiscally or otherwise—that is why the California statutes made the experiment contingent on federal approval in the first place.

■ While the Secretary suggests that California might evade § 1396a(c)(1) by submitting Medicaid plan amendments rather than Medicaid plans, § 1396a(c)(1) *requires* the Secretary to reject a state plan for medical assistance if the state's AFDC payment levels are less than they were in May, 1988. *Stowell,* 976 F.2d at 69.[18] The Secretary's speculation that she and California might conspire to evade this mandatory language does not defeat plaintiffs' standing.

### B. *Reviewability*

■ The district court also correctly found that § 1315(a) waivers are subject to APA review. The Secretary contends that § 1315(a) waivers are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), thus barring APA review. She emphasizes that § 1315(a) authorizes a waiver "to the extent and for the period *[the Secretary] finds* necessary" (rather than to the extent and period *necessary* ) and allows waivers for projects which *"in the judgment of the Secretary* [are] likely to assist in promoting the objectives" of the Act (rather than for projects which

*will* assist in promoting these objectives).[19] 42 U.S.C. § 1315(a)(1) (emphasis added). We disagree.

■ The APA embodies a "basic presumption of judicial review." *Lincoln v. Vigil,* —— U.S. ——, ——, 113 S.Ct. 2024, 2030, 124 L.Ed.2d 101 (1993) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)).[20] Absent an explicit statutory bar, judicial review of agency action is available except "in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply," *Webster v. Doe,* 486 U.S. 592, 599, 108 S.Ct. 2047, 2051, 100 L.Ed.2d 632 (1988),[21] and "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

■ Whether any particular statute meets this standard is "statute specific and relates to the language of the statute and whether the general purposes of the statute would be endangered by judicial review." *Esmeralda v. Department of Energy,* 925 F.2d 1216, 1218–19 (9th Cir.1991) (interpreting *Webster* and *Heckler* ) (internal citations omitted). Thus, the mere fact that a statute contains discretionary language does not make agency action unreviewable. *Id.* In finding that the CIA's decision to terminate an employee was not reviewable under the APA, the *Webster* Court relied not only on the discretionary language of the statute at issue but also on "the overall structure" of the statute, 486 U.S. at 600, 108 S.Ct. at 2052, and the fact that national security is "an area of executive action 'in which courts have long been hesitant to intrude.'" *Lincoln,* —— U.S. at ——, 113 S.Ct. at 2031 (quoting *Franklin v. Massachusetts,* —— U.S.

---

18. *See also Phoenix Baptist Hosp. & Medical Ctr. v. United States,* 728 F.Supp. 1423, 1426 (D.Ariz. 1989) (once the Secretary determines that a state program has failed to comply, she *must* take some action), *aff'd,* 937 F.2d 452 (9th Cir.1991).

19. The legislative history of § 1315(a) also suggests that Congress intended to give the Secretary considerable discretion. *See* Secr. Br. at 17 n. 15 (quoting such history); *Phoenix Baptist Hosp.,* 728 F.Supp. at 1426.

20. *See also Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2136, 90 L.Ed.2d 623 (1986) (there is a "strong presumption that Congress intends judicial review of administrative action").

21. *See also Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945).

——, ——, 112 S.Ct. 2767, 2785, 120 L.Ed.2d 636 (1992) (Stevens, J., concurring)).[22]

As the district court found, § 1315(a) does not implicate such traditionally unreviewable concerns. "[T]he granting of an exemption from statutory requirements is not an area of agency discretion traditionally unreviewable ... [and] it would be somewhat surprising were Congress to grant unreviewable discretion to the Secretary to exempt States from such an all encompassing series of statutory requirements." 853 F.Supp. at 1205. Unlike the lump-sum appropriation found unreviewable in *Lincoln*, the AFDC program contains complex and detailed regulations and does not reveal a congressional commitment to the unfettered discretion of the Secretary. *Lincoln*, —— U.S. at —— ——, 113 S.Ct. at 2031–32 (lump-sum appropriation with little guidance suggests congressional intent to give the agency maximum flexibility and discretion). Judicial review of § 1315(a) waivers would not interfere with the purposes of § 1315(a) or "endanger" the statutory scheme of the Social Security Act. *Esmeralda*, 925 F.2d at 1219; *cf. Bowen*, 476 U.S. at 680–81, 106 S.Ct. at 2141 (HHS regulations promulgated under certain provisions of the Medicare program are subject to APA review).

Moreover, § 1315(a) provides a meaningful standard by which to judge the Secretary's waiver. The statute does not give the Secretary unlimited discretion. It allows waivers only for the period and extent necessary to implement experimental projects which are "likely to assist in promoting the objectives" of the AFDC program; the AFDC program's objectives are set forth with some specificity in 42 U.S.C. § 601. *Cf. Webster*, 486 U.S. at 600, 108 S.Ct. at 2052 (emphasizing that the statute "allows termination of an Agency employee whenever the Director 'shall deem such termination necessary or advisable in the interest of the United States' ").[23] Unlike in *Webster*, the limitations set forth in § 1315(a) and § 601 provide meaningful standards by which the Secretary's decision can be judged.

Every court which has considered the issue has concluded that § 1315(a) waivers are subject to APA review.[24] We agree.

## C. *The Secretary's Obligation Under § 1315(a)*

■ The Secretary next contends that, even if APA review is available, the instant waiver was not arbitrary and capricious because § 1315(a) does not require her to consider plaintiffs' objections. She admits that plaintiffs and amici "raise serious concerns about California's undertaking, including consequences stemming from the loss of income,

**22.** *See also Heckler*, 470 U.S. at 830, 105 S.Ct. at 1655 (holding unreviewable the FDA's decision not to begin enforcement proceedings against a state government for using certain drugs in state executions because an agency's decision to bring enforcement proceedings involves "a complicated balancing of a number of factors which are peculiarly within" the agency's expertise and is traditionally unreviewable).

**23.** *See also E.J. Friedman Co., Inc. v. United States*, 6 F.3d 1355, 1359 (9th Cir.1993) (no APA review where statute provides that IRS *may*, in its discretion, issue a certificate of discharge); *Adams v. FAA*, 1 F.3d 955, 956 (9th Cir.1993) (per curiam), *cert. denied*, —— U.S. ——, 114 S.Ct. 690, 126 L.Ed.2d 657 (1994) (APA review unavailable for an FAA decision not to renew a Pilot Examiner Designation where the relevant statute allowed the FAA to rescind a license " 'at any time and for any reason which he deems appropriate.' ") (quoting 49 U.S.C.App. § 1355(a) (1988)); *State of Nevada v. Watkins*, 914 F.2d 1545, 1563 (9th Cir.1990), *cert. denied*, 499 U.S. 906, 111 S.Ct. 1105, 113 L.Ed.2d 215 (1991). In contrast, the Supreme Court has held APA review is available for an agency decision to build a highway through a public park where the relevant statute prohibits the use of federal funds to finance such a project if a "feasible and prudent" alternative route exists and requires "all possible planning to minimize harm" to the park. *Overton Park*, 401 U.S. at 404–05, 91 S.Ct. at 818.

**24.** 853 F.Supp. at 1205 (citing *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir.1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974); *Crane v. Mathews*, 417 F.Supp. 532, 539 (N.D.Ga.1976); *California Welfare Rights Org. v. Richardson*, 348 F.Supp. 491, 497 (N.D.Cal. 1972)) ("*CWRO*"); *cf. Georgia Hosp. Ass'n v. Department of Medical Assist.*, 528 F.Supp. 1348, 1355 (N.D.Ga.1982). *See also Esmeralda*, 925 F.2d at 1218–19 (holding that agency decision made pursuant to a provision of the Nuclear Waste Policy Act was subject to APA review, even though the statute at issue contained even more discretionary language than § 1315(a) and its legislative history evidenced an intent to grant broad discretion).

the failure to limit the study to those unable [sic] to work, and the statewide scope of the project" and "concedes that these matters deserve careful attention," but insists that *she* is not required to give them such attention. Secr. Br. at 34. We cannot agree.

While we accord an agency's interpretation of its statutory duties considerable deference, we simply cannot reconcile the Secretary's argument with the plain language of § 1315(a), its legislative history, and the Social Security Act of which it is a part. Read in context, § 1315(a) plainly obligates the Secretary to evaluate the merits of a proposed state project, including its scope and its potential impact on AFDC recipients.

### (1) § 1315 Must Be Read in Context

■ In interpreting § 1315, we must, of course, "follow the cardinal rule that a statute is to be read as a whole." *Conroy v. Aniskoff,* —— U.S. ——, ——, 113 S.Ct. 1562, 1565, 123 L.Ed.2d 229 (1993). "[T]he meaning of statutory language, plain or not, depends on context." *Id.*[25]

Section 1315(a) is a part of the Social Security Act, and allows the Secretary to waive a variety of federal regulations relevant not only to the AFDC program, but also to a variety of other categorical assistance programs serving elderly, blind, permanently disabled and medically needy persons.[26] Each of these statutes, and the AFDC statutes in particular, contains numerous, detailed, specific requirements with which states must comply in order to receive federal funding. While states are not required to participate in these federal programs, if they elect to participate, compliance with these regulations is mandatory.[27] The Secretary is responsible for ensuring that state programs comply with these comprehensive federal regulations and is required to take certain specific steps, culminating with the loss of funding, when state plans fail to comply. *See, e.g.,* 42 U.S.C. § 603. Moreover, under § 211 of the HHS Appropriations Act, 42 U.S.C. § 3515b, she must ensure that federal funds are not spent on experimental projects which pose a danger to human subjects' physical, mental or emotional well-being.

This legislative scheme, with its mandatory language and detailed requirements, evidences a clear Congressional intent to take certain decisions away from state officials.[28] In granting a § 1315(a) waiver, the Secretary allows the state to deviate from the minimum requirements which Congress has determined are necessary prerequisites to federal funding. While, ordinarily, the Secretary might reasonably argue that she ought to give state officials considerable discretion as to how to run a program, these federalism arguments have less weight in the context of a waiver of a congressional requirement. We are not examining the Secretary's authority to interfere with state officials' discretion, but rather her authority to waive compliance with federal statutes.

While § 1315 obviously represents a congressional judgment that, in certain circumstances, such an override is appropriate, we doubt that Congress would enact such comprehensive regulations, frame them in man-

---

**25.** *See also King v. St. Vincent's Hosp.,* 502 U.S. 215, ——, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991); *Sullivan v. Everhart,* 494 U.S. 83, 88, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990); *Massachusetts v. Morash,* 490 U.S. 107, 115, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989).

**26.** Specifically, § 1315(a) authorizes waiver of any of the requirements of 42 U.S.C. § 302 (Old Age Assistance), § 602 (the AFDC Program), § 654 (the AFDC Program), § 1202 (Aid to the Blind), § 1352 (Aid to the Permanently Disabled), § 1382 (Supplemental Security Income (SSI) Program), and § 1396a (Medicaid).

**27.** *See, e.g.,* 42 U.S.C. §§ 602 *et seq.,* 1396a(c); *Philbrook v. Glodgett,* 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975); *Rosado,* 397 U.S. at 417, 90 S.Ct. at 1220; *King v. Smith,* 392 U.S.

309, 316–17, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968); *Stowell v. Ives,* 976 F.2d 65, 69 (1st Cir.1992) (specifically addressing § 1396a(c)); *McCoog by and through Ferguson v. Hegstrom,* 690 F.2d 1280 (9th Cir.1982); *Arizona State Dep't of Pub. Welfare v. Department of H.E.W.,* 449 F.2d 456 (9th Cir.1971), *cert. denied,* 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972).

**28.** *Accord Rosado v. Wyman,* 397 U.S. at 417, 90 S.Ct. at 1220 (while states may pursue "what is beyond dispute the laudable goal of administrative efficiency ... Congress has foreclosed them from achieving this purpose at the expense of significantly reducing the content of their standard of need").

datory language, require the Secretary to enforce them, and then enact a statute allowing states to evade these requirements with little or no federal agency review. Rather, Congress intended that the Secretary would "selectively approve[]" state projects. S.Rep. No. 1589, 87th Cong., 2d Sess. 20, *reprinted in* 1962 U.S.C.C.A.N.1943, 1962. The Secretary's own regulations and previous treatment of state projects confirm that she has plenary authority to reject state projects and to require states to modify projects to make them more consistent with federal requirements, less likely to harm recipients, and more likely to further the goals of the Social Security Act.[29] Indeed, in approving California's project, the Secretary exercised this authority to reject California's proposed method of data collection and to require California to include a control group. ER 1192. Any argument, then, that the Secretary does not have authority to review the merits of a state proposal, or must simply accept whatever project the state submits seems not only "disingenuous," Dist. Ct. Order at 18, but wholly inconsistent with congressional intent and the structure of the Social Security Act.

## (2) *The Plain Language of § 1315*

Moreover, § 1315(a) plainly requires the Secretary to review state proposals. On its face, the statute allows waivers only (1) for experimental, demonstration or pilot projects, which (2) in the judgment of the Secretary are likely to assist in promoting the objectives of the Social Security Act and only (3) for the extent and period she finds neces-

sary. Thus, while the Secretary has considerable discretion to decide which projects meet these criteria, she must, at a minimum, examine each of these issues.

(i) *"An Experimental, Pilot or Demonstration Project."* First, § 1315(a) requires that the state project be an "experimental, demonstration or pilot" project. The statute was not enacted to enable states to save money or to evade federal requirements but to "test out new ideas and ways of dealing with the problems of public welfare recipients." S.Rep. No. 1589, 87th Cong., 2d Sess. 20, *reprinted in* 1962 U.S.C.C.A.N. 1943, 1961. Thus, the Secretary must make some judgment that the project has a research or a demonstration value. A simple benefits cut, which might save money, but has no research or experimental goal, would not satisfy this requirement.[30] Rather, the "experimental or demonstration project" language strongly implies that the Secretary must make at least some inquiry into the merits of the experiment—she must determine that the project is likely to yield useful information or demonstrate a novel approach to program administration.

(ii) *"Likely To Assist in Promoting The Objectives" of the Act.* Second, the Secretary must determine that the proposed project is likely to further the objectives of the AFDC program. The AFDC program was enacted:

> [f]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance

---

29. *See, e.g., Aguayo*, 473 F.2d at 1097, 1103 n. 21 (noting that the Secretary reduced the duration of New York's proposed AFDC work project from three years to one and, before approving the project, asked for further information on the state's child-care facilities and fair hearing procedures as well as a statement that the state would reimburse recipients' work-related expenses).

30. Since the AFDC program goals explicitly include the efficient use of state resources, Secr.Br. at 21 (citing 42 U.S.C. § 601), § 1315(a) may well contemplate experiments which aim to determine *whether* a certain reform will save money. However, a simple statewide benefits cut is not, in and of itself, an experiment designed to determine whether the AFDC program might be

run more efficiently. The immediate fiscal impact of reducing benefits is obvious, and such a benefits cut does not constitute an experiment unless data is collected, some other reform is implemented, or the program has some legitimate research component. *Cf. Arkansas Medical Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 522 (8th Cir.1993) (affirming district court order invalidating state Medicaid reimbursement plan where the scheme "was set solely on the basis of budgetary considerations, and without regard to the requirements of the federal Medicaid statute"); *Lapeer County Medical Care Facility v. State of Mich. Through Dep't of Social Servs.*, 765 F.Supp. 1291, 1298 (W.D.Mich.1991) ("budgetary considerations ... cannot excuse noncompliance with federal Medicaid laws").

... as far as practicable under the conditions in each State, to needy dependent children and their parents or relatives ... to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection. . . .

42 U.S.C. § 601.

As this statute, its legislative history, and courts have made clear, the AFDC program's main objective is to support needy children. *See, e.g., King v. Smith,* 392 U.S. 309, 325, 88 S.Ct. 2128, 2137, 20 L.Ed.2d 1118 (1968) ("the protection of such children is the paramount goal of AFDC").[31] Thus, in determining that a state project is "likely to further the goals of the Act," the Secretary must obviously consider the impact of the state's project on the children and families the AFDC program was enacted to protect.[32]

Other federal laws and the Secretary's own regulations support this interpretation. For example, § 211 of the HHS Appropriations Act, 42 U.S.C. § 3515b, requires the Secretary to ensure that HHS does not fund any research program or project which poses a danger to the physical, mental, or emotional well-being of a participant without the participant's informed consent. HHS regulations implementing § 211 require most research involving human subjects to undergo independent Institutional Review Board ("IRB") review. *See* 46 CFR § 46.101 *et seq.* Section 46.101(b)(5) of these regulations exempts research projects, including most public ben-

efits research, "which are conducted by or subject to the approval of department or agency heads" from this requirement. According to the Secretary, IRB review of such projects is unnecessary because § 1315(a) "specifically provides that projects thereunder be consistent with the purposes of the program." 48 Fed.Reg. 9266, 9269 (1983). Thus, IRB review of public benefits projects would be "duplicative and needlessly burdensome." *Id.* This rationale implicitly acknowledges that § 1315(a) review includes an examination of the proposed project's potential danger to participants' physical, mental and emotional well-being. Other HHS comments have explicitly acknowledged this obligation.[33]

Second, as even the Secretary concedes, her duty to determine whether a state program will further the goals of the Act clearly includes some duty to examine the scope of the project. The scope of a proposed project is obviously relevant to its ability to further the objectives of the Act, including its potential to harm recipients. An experiment that eliminated AFDC benefits entirely in order to collect data about four families is less likely to further the objectives of the Act than one that reduces benefits slightly and collects data about all of the participants in the experiment. *See CWRO v. Richardson,* 348 F.Supp. 491, 498 (N.D.Cal.1972) ("[T]he Secretary would abuse his discretion if he were to approve a [§ 1315(a) ] project which ... subject[ed] an unreasonably large population to the experiment or continu[ed] it for an unreasonably long period of time.").

---

**31.** *See also Dandridge v. Williams,* 397 U.S. 471, 510, 90 S.Ct. 1153, 1174, 25 L.Ed.2d 491 (1970) (Marshall, J., dissenting) ("Since its inception in the Social Security Act of 1935, the focus of the federal AFDC program has been to provide benefits for the support of dependant children of needy families with a view toward maintaining and strengthening family life within the family unit.").

**32.** *Cf. Rodway v. Department of Agriculture,* 514 F.2d 809, 818–24 (D.C.Cir.1975) (Secretary must consider health and well-being of recipients in setting food stamp allotments).

**33.** *See, e.g.,* 48 Fed.Reg. at 9266–67 (1983):
the Department has an obligation, pursuant to the conditions imposed upon its continuing

appropriations, to ensure that research activity not present a danger to the physical, mental or emotional well-being of participants. . . . the Department will include in its review of proposed research activity consideration of the effects on participants. To the extent that the proposed activity is determined to pose a danger to the participants, informed consent in writing will be required.
*See also id.* at 9269 ("there will be a well-defined responsibility of federal program officials to take into consideration potential risks to the health and safety of participants in research activity before making decision whether or not to approve particular projects."); 51 Fed.Reg. 20216 (1986); 53 Fed.Reg. 45667 (1988).

Moreover, in determining that public benefits experiments need not undergo independent IRB review, the Secretary has indicated that "ethical and other problems raised by research in benefit programs will be addressed by the officials who are familiar with the programs and responsible for their successful operation." 48 Fed.Reg. 9268 (1983). An inquiry into the ethical problems raised by research includes some evaluation of the risks the experiment poses, a review of alternative designs, and some effort to reduce risks "to those necessary to achieve the research objective." *The Belmont Report*, 44 Fed.Reg. 23196 (1979). While the Secretary may defer to the state's judgment about many aspects of the proposed experiment and exercises considerable discretion over what risks are necessary, she must make some determination that a project does not pose unnecessary risks to human subjects.

Plaintiffs contend that California's experiment endangers needy children and is unnecessarily broad in scope—it cuts benefits statewide but collects data about only a few recipients and it imposes a "work-incentive" cut on recipients who cannot work due to disability or who are in child-only units. These objections address the project's potential impact on welfare recipients and its scope. As the Secretary concedes, such "objections raise considerations of a type relevant to the Secretary's decision under [§ 1315(a)] concerning whether a proposed project serves the Act's objectives." Secr. Br. at 14.[34] Thus, under both the Secretary's reading of § 1315 and our independent review of the statute, the Secretary was required to consider plaintiffs' objections.

(iii) *Extent and Period Necessary.* Finally, § 1315 requires the Secretary to issue a waiver only for the "extent and period she finds necessary." The Secretary insists that this language does not obligate her to engage in any additional inquiry, once she determines that the state project furthers the goals of the Act. Rather, she contends, the phrase means only that she must determine which waivers are necessary to allow the state to implement an experiment of whatever extent and period the state has proposed. In her view, the "extent and period" inquiry is simply a nondiscretionary, rote review of which federal statutes conflict with the experiment and must be waived. According the Secretary, we must defer to this interpretation under the cases holding that agency interpretations of relevant statutes are entitled to deference.

■ However, such deference is not appropriate if an agency's interpretation of a relevant statute conflicts with the statute's plain meaning. *Sullivan v. Everhart*, 494 U.S. 83, 88–89, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990); *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Nor does it apply to statutory interpretations which appear to have been adopted for purposes of litigation, and which are not supported by any other evidence in the record. *Alaniz v. Office of Personnel Management*, 728 F.2d 1460, 1465 (Fed.Cir.1984). Finally, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardozo–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (*quoting Watt v. Alaska*, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)).

Plaintiffs contend that the Secretary's reading of the "extent and period" language conflicts with the statute's plain meaning, was adopted specifically for purposes of this litigation, and is not consistent with her own regulations and previous actions. The district court agreed that the Secretary's inter-

---

34. However, she insists that plaintiffs have "refrained from challenging" her determination that California's project serves the Act's objectives, and instead rely solely on an argument that § 1315(a) mandates a two-step inquiry. This argument reads plaintiffs' objections too narrowly. While plaintiffs concede that a "work-incentive" experiment might further the goals of the Act, they do not concede that California's experiment, or parts of it, further the objectives of the Act. Thus, although they cite the "extent and period" provision of § 1315(a) as evidence that the Secretary has a duty to issue waivers no broader than needed to accomplish a state's goals, their argument does not depend on this reading of § 1315(a).

pretation was "disingenuous" in light of the Secretary's treatment of other proposed experiments, the detailed Terms and Conditions proposed in this experiment, and HHS regulations generally. 853 F.Supp. at 1207–08. We also find nothing in the record or § 1315(a)'s 32–year history suggesting that the Secretary has previously interpreted the statute in this manner. Neither case law[35] nor legislative history[36] supports the Secretary's reading. Moreover, the Secretary's interpretation does not seem entirely consistent with the statute's discretionary language,[37] Congress's clear intent to require states to adhere to federal guidelines except in narrow circumstances, or the Secretary's statutory obligations to oversee AFDC programs and to ensure that federal money is not spent on projects which endanger human subjects.[38] In light of the Secretary's broad discretionary authority over federal and state cooperative programs and her obligation to enforce Congress's comprehensive regulations, we have difficulty discerning a congressional purpose to require her to waive any and all federal regulations whenever a state proposes an "experiment" which has some ability to further the goals of program.

However, we need not resolve this issue of statutory interpretation or determine the precise meaning of § 1315(a)'s "extent and period" language. The Secretary concedes that plaintiffs' objections are relevant to her inquiry under the first prong of the § 1315 inquiry—whether the state project is likely to further the objectives of the Act. Thus, regardless of the precise meaning of the "extent and period" clause, the issues plaintiffs raise are relevant factors for purposes of the § 1315(a) waiver decision. We must therefore determine whether the administrative record is sufficient to show that the Secretary in fact considered them.

## D. *The Administrative Record*

■ Plaintiffs have indisputably shown that California's experiment has serious problems, both as an experiment and as an attempt at welfare reform. The actors in this case—including the Secretary, the district court, and impressively credentialed amici[39]—agree that both the statewide scope of

---

**35.** The Secretary relies on the Second Circuit's statement that "the only limitation imposed on the Secretary was that he must judge the project to be 'likely to assist in promoting the objectives' of the [Act]." *Aguayo v. Richardson*, 473 F.2d 1090, 1105 (2d Cir.1973), *cert. denied*, 414 U.S. 1146, 94 S.Ct. 900, 39 L.Ed.2d 101 (1974) (citing *CWRO*, 348 F.Supp. 491 (1972)). However, the Second Circuit was responding to an argument that § 1315(a) "does not permit the Secretary to waive any requirement of § 602 which might result in the curtailment or denial of assistance." *Id.* at 1104. Neither the *Aguayo* court nor the *CWRO* court addressed the implications of the extent and period language, or responded to claims that the Secretary's waiver was broader then necessary.

In fact, the *CWRO* court also emphasized the significance of the scope of the project. In upholding the project at issue, the court emphasized that the project was "definitely limited in scope and duration" and stated:

it is clear that the Secretary would abuse his discretion if he were to approve a project which went beyond that point by either subjecting an unreasonably large population to the experiment or by continuing it for an unreasonably long period of time.

348 F.Supp. at 498. In context, the *Aguayo* court's statement is not only dicta in an out of circuit case, but dicta written with an entirely different issue in mind.

**36.** The Secretary relies on a congressional statement that § 1315(a) authorizes the Secretary "to waive plan requirements to the extent that he believes this action is necessary to carry out a demonstration or experimental project, *if* such project furthers the general objectives of the program." S.Rep. No. 1589, 87th Cong., 2d Sess. 19–20 (1962) (emphasis added), *reprinted in* 1962 U.S.C.C.A.N. 1943, 1961, 1962; *accord* H.R.Rep. No. 1414, 87th Cong., 2d Sess. 24 (1962). This reliance is misplaced. The statement is ambiguous, and could mean either that the Secretary should waive requirements only when absolutely necessary to enable to the state to achieve its goals or that she should waive whatever requirements are necessary to enable to the state to implement its project.

**37.** The statute refers to the "extent and period *[the Secretary] finds* necessary," suggesting that Congress envisioned something other than a rote examination of which statutes the experiment violates and an automatic granting of any waivers needed to implement the experiment.

**38.** *See* note 33, *supra.*

**39.** Amici include 19 biomedical and social scientists, physicians and other health care professionals, philosophers, and lawyers who served on the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Re-

the benefits cut as well as the decision to cut benefits to individuals who cannot work appear wholly unjustified by any legitimate experimental goal. State officials have advanced no such experimental goal, and we are unable to explain how it would advance social science to cut benefits to recipients who are not even included in the study. Amici accurately observe that such a design is "methodologically indefensible" in that it exposes a large number of subjects to potential harm, yet studies only a few. Amici Br. at 24.

Moreover, the idea of imposing a work-incentive benefits cut on individuals whose disabilities preclude work can only be called absurd. As the district court found, "the Demonstration Project was intended to create work-incentives for recipients able to work; the effect of the project on those disabled recipients who are unable to work appears unintended and serves no stated goal of the project." 853 F.Supp. at 1213. "[T]he State could exclude from the benefit cut those of the disabled who are unable to work" and "[i]t would be humane to do so." *Id.* at 1214.[40]

Nearly everyone also agrees that California's experiment will put "child-only" AFDC families, AFDC families headed by adults who are too disabled to work, and families whose heads are unable to find work—or cannot work due to child-care, transportation, and other difficulties—at increased risk of homelessness, inadequate nutrition, and a variety of emotional and physical problems. Amici Br. at 21; Secr. Br. at 34. The program offers no work-training, child-care, or any other assistance designed to enable recipients to find and keep jobs. Moreover, given the minimum level of benefits already paid to AFDC families, it is difficult to imagine that the benefits cut would radically change the existing incentives to work. As plaintiffs point out, California could have accomplished its goal of increasing recipients'

incentive to work without cutting AFDC benefits at all, by simply allowing recipients to keep more of their earned income.

Given these various problems, plaintiffs' expert contends that California's experiment is "utterly unconscionable," ER 51, and amici argue that it "flagrantly disregards the basic norms of research." Amici Br. at 3.

■■■■■ However, we have no jurisdiction to review the wisdom of California's undertaking. The APA does not give this court power "to substitute its judgment for that of the agency" but only to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgement." *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823–24. We may reverse only if the decision was "arbitrary and capricious" within the meaning of the APA, 5 U.S.C. § 706(2)(A), in that

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfr. Ass'n v. State Farm Ins.*, 463 U.S. 29, 44, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

■■■■■ In examining this issue, we may not consider reasons for agency action which were not before the agency. *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 627, 106 S.Ct. 2101, 2112, 90 L.Ed.2d 584 (1986). Although we may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Motor Vehicle*, 463 U.S. at 43, 103 S.Ct. at 2867, we cannot infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals. *Id.* at 57, 103 S.Ct. at 2874.[41] Rather, "an

---

search or its staff or on the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research or its staff.

**40.** *Cf. Aguayo,* 473 F.2d at 1095 (limiting experiment to "employable" recipients).

**41.** *See also SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947) ("[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action."); *City of Mesa v. FERC,* 993 F.2d 888, 897 n. 7 (D.C.Cir.1993); *Common Cause v. FEC,* 906 F.2d 705, 706–07 (D.C.Cir.1990) (re-

agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* at 50, 103 S.Ct. at 2870.[42] Thus, while formal findings are not required, the record must be sufficient to support the agency action, show that the agency has considered the relevant factors, and enable the court to review the agency's decision. *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985).

In the present case, the record contains a rather stunning lack of evidence that the Secretary gave plaintiffs' objections any such consideration. Except for the Secretary's conclusory letter to plaintiffs' counsel and possibly her decision to limit California's authority to cut benefits, the record contains no evidence that the Secretary ever considered the danger California's benefits cut would pose to recipients, the state's decision to impose a statewide benefits cut, the need for cutting benefits as a work-incentive, the merits of imposing a work-incentive cut on individuals whose disabilities preclude work, or the feasibility of excluding individuals who receive federal disability benefits or have already been adjudged unable to work in the context of other government programs such as California's Greater Avenue for Independence ("GAIN") program. Neither the Secretary nor California ever responded to the substance of plaintiffs' objections, and the Secretary did not revise the Terms and Conditions at all in response to plaintiffs' comments.

Nonetheless, the district court found the record adequate (1) because the court believed the record was similar to that which the Second Circuit found adequate in *Aguayo,* 473 F.2d 1090; (2) because plaintiffs submitted their objections before the Secretary issued her decision; and (3) because the court believed that equity and intercounty migration justified the experiment's scope. 853 F.Supp. at 1207–09. We disagree.

First, the *Aguayo* record included not only the Secretary's decision and the plaintiffs' objections, but also a state memoranda answering plaintiffs' objections. *Aguayo,* 473 F.2d at 1106 ("the State submitted two memoranda ... identifying the objections and ... endeavoring to answer them").[43] In upholding the Secretary's decision (as to most but not all of the experiment) the Court noted that New York's attempt to refute plaintiffs' objections was "successful at least to a substantial degree." *Id.* Moreover, the Secretary required the state to submit additional information relevant to many of plaintiffs' objections, including the quality of the child-care facilities the state would offer, the fair hearing procedures, and a statement that the state would reimburse recipients' work-related expenditures. *Id.* at 1097. The instant case contains no such memoranda, no request for additional information related to the project's impact on recipients, no statement explaining the need for a statewide benefits cut, and no indication that the Secretary had any information refuting plaintiffs' substantial documentary evidence about the benefit cut's danger to human subjects.

■ Second, a court should not infer that an agency considered an issue merely because it was raised, where there is no indication that the agency or other proponents

---

versing where there was no mention in the record that the agency considered a relevant factor); *Cross–Sound Ferry Servs., Inc. v. ICC,* 873 F.2d 395, 400 (D.C.Cir.1989) (court will not guess); *American Trading Transp. Co. v. U.S.,* 791 F.2d 942, 948–49 (D.C.Cir.1986) (holding agency action invalid where there was no evidence that the agency considered a statutory goal).

42. *See also Alaniz v. Office of Personnel Management,* 728 F.2d 1460, 1466 (Fed.Cir.1984) (no evidence in record that agency actually considered position advanced in litigation); *United States Information Agency v. FLRA,* 960 F.2d 165, 170 (D.C.Cir.1992) (rationale for decision must come from agency, "not from counsel"); *Kansas City v. HUD,* 923 F.2d 188, 192 (D.C.Cir.1991).

43. Similarly, in *Crane v. Mathews,* 417 F.Supp. 532 (N.D.Ga.1976), the district court initially issued a temporary injunction preventing implementation of a Medicaid waiver project because agency officials approved the project based on a staff memorandum which did not "set forth a precise articulation of the manner in which the project was likely to assist in achieving the [Act's] objectives." *Id.* at 537. The court lifted the injunction only after defendants prepared a second memorandum which "set forth in considerable detail the ... objectives which the project was designed to achieve." *Id.* at 538.

refuted the issue. *See, e.g., National Wildlife Fed'n v. FERC,* 801 F.2d 1505, 1512 (9th Cir.1986) (vacating and remanding for further consideration of petitioners' objections where, as here, the agency "simply did not mention the extensive and uncontradicted evidence offered by petitioners" or explain its rejection of the options they proposed).

Here, the record contains no evidence that the Secretary considered the materials plaintiffs submitted. While the state and HHS exchanged detailed drafts of the Terms and Conditions, these drafts did not address any of plaintiffs' objections. Even if these drafts show, as the district court found, that a "good deal of thought went into approval of the research design," 853 F.Supp. at 1208, they do not show that HHS gave any such thought to plaintiffs' objections or proposed alternatives. If anything, the timing of the waiver approval—HHS's final changes to the draft Terms were made on the very day it received plaintiffs' objections—suggests the opposite. *Cf. Asarco, Inc. v. U.S.E.P.A.,* 616 F.2d 1153, 1162 (9th Cir.1980) (decision arbitrary and capricious where there was evidence agency had considered issues but did so in a manner which was insufficient and abstract).

Thus, district court erred in inferring that the Secretary considered plaintiffs' objections merely because plaintiffs submitted them. *Id.* at 1206–07 (citing *Aguayo,* 473 F.2d at 1105–06). Such an inference is inappropriate and would provide a perverse disincentive to advocates to refrain from raising relevant issues during the administrative process.

■ The district court similarly erred in inferring that the statewide scope of the project was necessary "for reasons of equity and to avoid the possible movement of AFDC recipients from counties covered by the project to those that were not." 853 F.Supp. at 1206–07. Neither the state nor the Secretary ever mentioned these issues during the administrative process and nothing in the administrative record suggests that the Secretary in fact considered them. Thus, even if such factors were to justify California's experiment,[44] they cannot be considered. *Bowen,* 476 U.S. at 627, 106 S.Ct. at 2112.

■ The Secretary's letter to plaintiffs' counsel stating that she "considered the issues [plaintiffs] raised" is similarly insufficient. ER 1497.[45] "Stating that a factor was considered ... is not a substitute for considering it." *See Getty v. Federal Savs. & Loan Ins. Corp.,* 805 F.2d 1050, 1055 (D.C.Cir. 1986) (rejecting as "conclusory" a similar agency statement that all relevant factors had been considered).[46]

---

44. "Equity" does not seem much of an explanation, especially as the experiment already includes a control group subject to the old rules. Moreover, as plaintiffs and amici note, the problem of intercounty migration might be addressed by tracking or other experimental techniques. *See* Rand Health Insurance Study, ER 1013 (using adjustment factors to compensate for subjects' response to the experimental design); Amici Br. at 26 n. 25. In fact, the problem of intercounty migration exists even under the present design and was the subject of much discussion. ER 1414, 1417, 1487. State officials expect that such migration will be minimal and have a plan to track some cases and replace others with new research participants. *Id.* Certainly, nothing in the record indicates that keeping subjects at their existing benefit levels and tracking them if they move is administratively infeasible.

The Secretary does not even contend that intercounty migration and equity justify the experimental design, instead arguing that she has discretion to determine that "an attempt to alter and assess work incentives may require a project of significant scale and duration" or that a state-wide project was necessary "to analyze what reforms should be undertaken on a nationwide basis." Secr.Br. at 20 n. 21, 21. However, the administrative record contains no evidence that she in fact made such a determination.

45. In this letter, dated November 30, 1992, over a month after the experiment was approved, the Secretary stated:

This is in response to your letter of October 16, in which you presented your concerns about California's second waiver proposal. The proposal was approved after a careful review of all the issues, including those raised in your letter. ER 1497. The letter does not give any other explanation of the Secretary's decision.

46. *See also Sears Sav. Bank v. Federal Sav. & Loan Ins. Corp.,* 775 F.2d 1028, 1030 (9th Cir. 1985) (rejecting bank board's claim that it had considered the relevant issues, despite the presence of a staff memo which mentioned the disputed points because "[t]he Board's resolution fail[ed] to mention or adopt the memorandum's rationale").

Rather, the only indication that the Secretary considered the project's potential impact on human subjects is her decision to limit California's authority to cut benefits to 6.3%. This evidence, while limited, might ordinarily be sufficient to conclude that the Secretary in fact considered the project's potential impact on AFDC recipients. We might fairly infer, from this decision, that she somehow determined that a cut of this magnitude would not pose a danger to human subjects.

However, the Secretary also approved cuts of up to 80% to recent entrants and chose the 6.3% cut-off without examining any data about the cost of living in California or other issues relevant to the danger determination. *See National Treas. Employees Union v. Horner,* 854 F.2d 490, 499 (D.C.Cir.1988) (agency action arbitrary where the record did not include "data of the sort [the agency] would had considered if it had considered [the issue] in any meaningful way"). Moreover, the Secretary's decision to limit the cut does not explain its application to people who, according to the state's own judgment, should be exempted from other work requirements and who are entitled to collect disability benefits. Neither the state nor HHS has offered any explanation as to why such persons were included in the "work-incentive" cut, or any evidence that it would be "administratively infeasible" to exempt them.

In the face of this extraordinarily sparse administrative record and the Secretary's concession that the issues plaintiffs and amici raise deserve attention, we must REVERSE. The Secretary's waiver of 42 U.S.C. § 1396a(c)(1) is VACATED[47] and the case is REMANDED to the district court with instructions to remand to the Secretary for additional consideration of plaintiffs' objections.[48]

REVERSED AND REMANDED.

O'SCANNLAIN, Circuit Judge, dissenting:

I respectfully dissent. For the reasons expressed in Judge Levi's well-crafted mem-orandum of decision and order (unpublished), I would affirm. Given the extremely deferential standard under which we review the Secretary's decisions under 42 U.S.C. § 1315, I believe that the agency record provides more than sufficient support for the Secretary's waiver.

As the court's opinion rightly states, an agency's decision is arbitrary and capricious, and may be reversed, only if:

the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfr. Ass'n v. State Farm Ins.,* 463 U.S. 29, 44, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). The court misconstrues this rule. It fails to recognize that the rule severely narrows the scope of this court's review. Recall the Supreme Court's language: "entirely failed" and "so implausible." These are words of extremes; they indicate that an agency decision should be reversed only in the rare case when it is utterly unsupported by the record.

This is not such a case. Rather, the instant proceeding is very similar to *Aguayo v. Richardson,* 473 F.2d 1090 (2d Cir.1973), the only other appellate case to review the Secretary's waiver of federal requirements under Section 1315 and approval of an experimental welfare project. In *Aguayo,* as here, the Secretary approved New York's proposed welfare program without a statement of the grounds for its decision. *Id.* at 1103. Nevertheless, Judge Henry J. Friendly, writing for the court, concluded that "[w]e are satisfied that the materials before the Secretary sufficed for 'a consideration of the relevant factors' by him and that there was no 'clear error of judgment' on his part." *Id.* at 1106 (quoting *Citizens to Preserve Overton Park,*

---

**47.** Plaintiffs do not challenge the Secretary's waiver of the 100–hour rule and other income disregard provisions related to the experiment; thus, these waivers remain in effect.

**48.** We therefor do not address plaintiffs' human subjects claim or ADA claim and express no opinion on the merits of these claims.

*Inc. v. Volpe,* 401 U.S. 402, 426, 91 S.Ct. 814, 851, 28 L.Ed.2d 136 (1971)).

The majority attempts to distinguish *Aguayo* because the *Aguayo* agency record included not only the plaintiffs' objections to the welfare plan, but also a memorandum prepared by the state responding to these objections. This is both true and irrelevant. Although California did not similarly respond to the appellants' objections, the agency record does include extensive information on the proposed program. Besides California's application for the waiver, the Secretary had before her the appellants' "voluminous materials" about the claimed harms the program would cause. Here, as in *Aguayo,* the Secretary had sufficient data—including information and arguments supporting both sides of the dispute—for a consideration of the relevant factors in making her decision. I would not presume, as the majority does, that the Secretary simply ignored these materials. The lack of a memorandum from the state responding to the appellants' materials means nothing. Nor would I presume, as the majority infers, that the record is underdeveloped. Quoting Judge Friendly once again, "the statute ... does not require that, before the Secretary approves an experiment, every i must be dotted and every t crossed." *Id.* at 1107.

Further, the Supreme Court has held that a reviewing court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle,* 463 U.S. at 43, 103 S.Ct. at 2867. The Secretary's path is discernible here. She was presented with information and arguments for and against the waiver. She accepted California's position and granted the waiver. This court is not empowered to review the merits of that decision. It certainly has no power to nit-pick nor second guess the policy judgment inherent in the scheme.

Because the extremely deferential standard for reviewing the agency's process controls the decision in this case, I need not comment on other issues discussed in the court's opinion.